[No. D049387. Fourth Dist., Div. One. Oct. 19, 2007.]

TG OCEANSIDE, L.P., Plaintiff and Appellant, v.
CITY OF OCEANSIDE et al., Defendants and Appellants.

1356

## COUNSEL

Hart, King & Coldren, Robert S. Coldren, C. William Dahlin and Mark D. Alpert for Plaintiff and Appellant.

Richards, Watson & Gershon, Rochelle Browne; John P. Mullen, City Attorney, and Barbara L. Hamilton, Assistant City Attorney, for Defendants and Appellants.

## OPINION

**O'ROURKE, J.**—The City of Oceanside (City) and the City of Oceanside Manufactured Home Fair Practices Commission (the Commission) appeal from a judgment issuing a petition for peremptory writ of administrative mandamus (Code Civ. Proc., § 1094.5) in favor of TG Oceanside, L.P. (Owner), a mobilehome park owner who had filed the petition challenging the decision by City and the Commission to deny it a rent increase. On Owner's administrative appeal of City and the Commission's decision, the administrative hearing officer affirmed the Commission's denial of a rent increase, concluding the evidence and City's expert demonstrated Owner was already earning a fair return and Owner had not overcome a presumption that the mobilehome park's base year rate of return was just and reasonable. The hearing officer nevertheless awarded Owner a $10.07 increase in monthly rents per space. On Owner's writ petition, the trial court set aside that decision and remanded the matter to the Commission to apply a return on investment approach that accounted for the effect of inflation on Owner's original and subsequent capital investment, and commanding City not to depreciate the investments. City contends (1) Owner's petition should have been dismissed for failure to join the administrative hearing officer as an indispensable party; (2) the trial court erred in rejecting City's expert economist's method for determining fair return; (3) Owner did not meet its burden to present evidence demonstrating it was not earning a fair return; and (4) the decisions of the hearing officer and the Commission are supported by substantial evidence.

Owner cross-appeals, contending (1) City and the Commission inconsistently used income-tax-based data to deny a deduction for interest expenses,

thus substantially overstating Owner's rate of return; and (2) no evidence justified the hearing officer's inclusion of rent-control-exempt income in determining fair return.

■ Though we reject City's indispensable party argument, we agree that the evidence presented by Owner on its special adjustment application did not serve to rebut an evidentiary presumption that existing rent adjustment formulas contained within City's rent control ordinance provide a fair return. Because the administrative hearing officer was required to presume this fact absent evidence to the contrary, the trial court erred in granting Owner's writ petition. We reject Owner's cross-appeal contentions, and consequently reverse the judgment with directions that the superior court deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Since 1980, Owner has operated Terrace Gardens mobilehome park (the Park), a 74-space mobilehome park in Oceanside. A portion of the Park (60 spaces) is subject to City's rent control ordinance—the Manufactured Home Fair Practices Ordinance 82-27 (the Ordinance), enacted in 1982.[1]

In April 2004, Owner submitted an application for a $204 per month "special adjustment" rent increase under the Ordinance (Ord., §§ 16B.10, subd. (d), 16B.15, subd. (a)(1)), seeking to raise the rents from approximately $279 to $475 a month per space. In a letter brief supplied by its counsel, Owner argued the rent increase was mandated by other rents for comparable mobilehome spaces, the Ordinance's automatic rent increases would not allow a fair return, and City could not presume the fairness of those increases. Owner offered alternative methodologies in support of its request for a special adjustment. It applied a 12 percent return-on-value method to

---

[1] This court summarized the Ordinance's formulas for yearly rent adjustments in *Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239], where we upheld the constitutionality of the alternative fair return formulas on a challenge to the Ordinance's facial validity. (See also *Kirkpatrick v. City of Oceanside* (1991) 232 Cal.App.3d 267, 281 [283 Cal.Rptr. 191].) Under the Ordinance, a park owner is entitled to an annual permissive rent adjustment equivalent to the lesser of 75 percent of the increase in the consumer price index (CPI) or 8 percent. (Ord., § 16B.9, subd. (c)(1); see *Oceanside Mobilehome Park Owners' Assn.*, 157 Cal.App.3d at p. 902, fn. 5 [explaining the CPI].) If the park owner believes that adjustment does not provide a just and reasonable return on his or her investment, the Ordinance permits the park owner to file for an alternative adjustment based on the park's net operating income (NOI), calculated from the park's gross income less operating expenses. (Ord., §§ 16B.9, subd. (c)(2), 16B.12.) If the park owner contends neither of these adjustments result in a just and reasonable return, he or she may apply for a special adjustment, which the Commission will consider at a public " 'fair return hearing.' " (Ord., § 16B.10, subd. (d).) At that hearing, the park owner bears a burden of rebutting a presumption that the other adjustments provided for in the Ordinance allow a park owner a just and reasonable return on investment for any given year. (Ord., § 16B.10, subds. (b), (c), (d).)

reach a proposed rent increase of $218.98 per space based on a real estate appraisal report by its expert John Neet, who estimated the market value of the Park at $2.15 million. Owner also proposed adjusting the Park's original purchase price ($1.2 million) for inflation, reaching an inflation-adjusted investment of approximately $2.10 million, justifying a $212.61 rent increase to make up the shortfall. Owner also sought a capital improvements monthly space rent increase of $37.97, explaining that that increase would become unnecessary if City allowed 100 percent of the increase sought under Owner's other alternative approaches.

To evaluate Owner's application, the Commission's staff hired two independent consultants for the matter: real estate appraiser James Brabant of Anderson & Brabant, Inc., who conducted an appraisal and comparable rents analysis, and James Gibson, Ph.D., of NewPoint Group Management Consultants, who performed a "fair return" analysis. Brabant compared the Park with other mobilehome parks in Oceanside and reached an overall rental value range of $279 to $300, calculating to a rental increase of $0 to $21 per month as of July 1, 2004. Dr. Gibson's analysis was based on his calculation of the Park's return on estimated assets for calendar/fiscal years for which he was provided Park financial data: 2001 through 2003, and also for the same three-year average. He divided the Park's estimated net income before interest and taxes by its estimated total book assets and compared the Park's three-year return on assets with data in a publication compiling real-estate-related-business rates of return (Troy, Almanac of Business and Industrial Financial Ratios (2004) (Almanac)). Applying Almanac benchmarks of a 9 percent return for the entire 74-space park (based on businesses with total assets of just above $1 million and $5 million), and a 10.40 percent return for the rent-controlled 60-space park (based on businesses with total assets of between $500,000 and $1 million), Dr. Gibson concluded Owner would not be entitled to a rent increase for the 74-space park having received a 9.72 percent return on total assets, and it would only be entitled to a $1.18 per space, per month rent increase for the 60-space, rent-controlled portion of the Park.

The Commission denied Owner's application, basing its determination on the entire 74-space park on the theory it was not reasonable to treat the Park as separate businesses in determining a fair return on investment. It found the Park was already earning a fair return and Owner had not rebutted the presumption the Park was earning a fair return as shown by Dr. Gibson's and Brabant's reports.

Owner appealed the Commission's decision to an independent hearing officer (Ord., § 16B.15, subd. (j)), retired Superior Court Judge David Moon, who reviewed the evidence presented to the Commission and, based on

detailed factual and legal findings, determined that Owner had not overcome the presumption that the Park's base year rate of return was just and reasonable. Nevertheless, following Dr. Gibson's recommendation, the hearing officer granted Owner a small upward monthly rental adjustment of $10.07, to "accomplish the purposes of the rent control ordinance."

Owner filed a verified petition for a writ of administrative mandamus naming City and the Commission as defendants. In part, it alleged City's return on investment methodology used by Dr. Gibson—using a depreciated value of the investment without adjusting it for inflation—punished long-term owners because it caused real returns to diminish over time, thus denying the park owner a fair return. It alleged the methodology violated the state and federal Constitutions and was inconsistent with the Ordinance's limited purpose of protecting residents from unreasonable rents.

The trial court issued a tentative ruling granting the petition. It first found Judge Moon was not an indispensable party to the action. On the fair return question, it ruled Owner had "met its burden of proof to demonstrate with substantial evidence that the Commission's final decision . . . is unreasonable or unlawful." Specifically, the court found Owner provided substantial evidence that the Commission had not accounted for inflation or capital improvements as respectively required by *H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1 [25 Cal.Rptr.3d 19] (*Berger*) and *Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com.* (1993) 16 Cal.App.4th 481 [20 Cal.Rptr.2d 371] (*Palomar*). The court rejected Owner's remaining arguments, finding City did not act contrary to law in including the rent-control-exempt spaces in calculating Owner's income. The court adopted its tentative as a statement of decision and issued a peremptory writ of mandate setting aside the Commission's decision, as well as the hearing officer's decision and commanding the Commission to reconsider its action, directing that it hear no new evidence on remand and instructing: "Any return on investment approach applied by the Commission must account for the effect of inflation on the park owner's original and subsequent capital investment and . . . City shall not depreciate the investments . . . ."

City filed the present appeal. Owner's cross-appeal followed.

## DISCUSSION

### I. *Indispensable Party*

Relying on *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564 [106 Cal.Rptr.2d 14] (*Kaczorowski*), City contends the court

should have dismissed Owner's petition for failure to join the hearing officer to which it appealed the Commission's decision. It asserts that under the Ordinance, it is the hearing officer's decision, not the Commission's decision, that is final and subject to judicial review, and it is now too late for Owner to join the hearing officer in the action.

## A. *Applicable Legal Principles*

Code of Civil Procedure section 389 subdivision (a) defines persons who should be joined in a lawsuit if possible, sometimes referred to as "necessary" parties. (*County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1149 [63 Cal.Rptr.2d 277].) It provides: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party." (Code Civ. Proc., § 389, subd. (a).) A determination that a person is a necessary party is the predicate for the determination whether he or she is an indispensable party (*Deltakeeper v. Oakdale Irrigation Dist.* (2001) 94 Cal.App.4th 1092, 1100 [115 Cal.Rptr.2d 244]) and requires analysis of the three distinct clauses of the above-referenced statute. (*Countrywide Home Loans, Inc. v. Superior Court* (1999) 69 Cal.App.4th 785, 792 [82 Cal.Rptr.2d 63].)

If a necessary party cannot be joined, the court shall "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder." (Code Civ. Proc., § 389, subd. (b).) None of these factors is determinative or necessarily more important than another. (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 35 [61 Cal.Rptr.3d 145]; *County of San Joaquin v. State Water Resources Control Bd.*, *supra*, 54 Cal.App.4th at p. 1149.) Further, the court's consideration of these factors

largely depends on the facts and circumstances of each case. (*Bakia v. County of Los Angeles of State of Cal.* (9th Cir. 1982) 687 F.2d 299, 301.)[2] The determination of whether a party is necessary or indispensable is one in which the court "weighs 'factors of practical realities and other considerations.' " (*Hayes v. State Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1529 [42 Cal.Rptr.3d 363] (*Hayes*).) In view of that standard, we review the trial court's ruling for abuse of discretion. (*Ibid.*, citing *Kaczorowski, supra*, 88 Cal.App.4th at p. 568.)

## B. Kaczorowski *and* Hayes

In *Kaczorowski*, the Court of Appeal considered whether the California Coastal Commission (the Coastal Commission) was an indispensable party to a writ proceeding involving a county planning commission's approval of a development permit absent preparation of an environmental impact report under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). (*Kaczorowski, supra*, 88 Cal.App.4th at p. 566.) Project opponents unsuccessfully appealed that decision to the county board of supervisors (the Board), and thereafter appealed to the Coastal Commission, which reviewed the permit application de novo. (*Id.* at pp. 568–569.) After the Coastal Commission granted the permit with certain conditions and found the development would not have significant adverse impacts on the environment, the plaintiff petitioned for a writ of mandamus and injunctive relief, naming the Board but not the Coastal Commission. (*Id.* at p. 567.) The Court of Appeal analyzed the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) and the Coastal Commission's role in conducting that de novo hearing: " 'A hearing *de novo* literally means a new hearing, or a hearing the second time. [Citation.] Such a hearing contemplates an entire trial of the controversial matter in the same manner in which the same was originally heard. It is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held. . . . The decision therein . . . takes the place of and completely nullifies the former determination of the matter.' [Citations.] Once the Commission conducted its de novo examination, there was no longer a decision by the Board to review. More fundamentally, the Board—although still interested in the matter—was no longer plaintiff's adversarial opponent. The Commission's findings that the proposed inn complied with CEQA superseded equivalent findings by the Board [citations] in precisely the same manner that the Board's decision superseded that of the planning commission. It was the Commission, not the Board, which issued the permit

---

[2] Code of Civil Procedure section 389 "tracks the language of its federal counterpart, rule 19 of the Federal Rules of Civil Procedure (28 U.S.C.). [Citation.] 'It is therefore appropriate to use federal precedents as a guide to application of the statute.' " (*Countrywide Home Loans, Inc. v. Superior Court, supra*, 69 Cal.App.4th at pp. 791–792, fn. omitted; see also *County of San Joaquin v. State Water Resources Control Bd., supra*, 54 Cal.App.4th at p. 1152.)

authorizing real parties to build their inn. The conditions of that permit were fixed by the Commission, not the Board." (*Kaczorowski*, 88 Cal.App.4th at pp. 569–570.)

The Court of Appeal reasoned that, under these circumstances, a judgment against the Board in the absence of the Coastal Commission would not bind the Coastal Commission nor would it be a complete determination of the controversy, and it would not be effective or adequate. (*Kaczorowski*, *supra*, 88 Cal.App.4th at p. 570.) The court held, in view of the "centrality" of the Coastal Commission's role, that its status as an indispensable party appeared as a matter of law. (*Id.* at pp. 570–571.)

*Kaczorowski* was distinguished by the Court of Appeal in *Hayes*, *supra*, 138 Cal.App.4th 1523, in which the petitioner, an autistic child acting through his guardian ad litem, sought to challenge the decision of an administrative law judge (ALJ) terminating his educational funding. (*Id.* at p. 1527.) In his writ petition, petitioner named as respondents the director of the California Department of Developmental Services (the Department), and the Department itself, which provided the ALJ through a contract with the Office of Administrative Hearings (OAH) under a statute requiring it to " 'contract for the provision of independent hearing officers' " to conduct fair hearings. (*Id.* at pp. 1527–1528, 1530.) The trial court dismissed the petition on grounds the final decision had been reached by the ALJ from OAH, not the Department, and because petitioner had not named OAH as a party the action could not proceed in equity and good conscience. (*Id.* at p. 1528.)

The Court of Appeal reversed, holding the OAH was neither a necessary nor indispensable party. (*Hayes*, *supra*, 138 Cal.App.4th at p. 1534.) Reviewing the roles of the Department and OAH under the relevant provisions of the Lanterman Developmental Disabilities Services Act (Lanterman Act) (Welf. & Inst. Code, § 4500 et seq.) under which the litigation arose, it pointed out that under the Lanterman Act and the contracts between the Department and OAH, OAH was the Department's statutorily appointed "designee," and in performing that role acted as the Department's representative. (*Hayes*, 138 Cal.App.4th at pp. 1531–1532.) The court held that given the statutory and contractual relationship between the Department and OAH, the Department and its director had the power to set aside the ALJ's decision, and depending on the type of challenge asserted by petitioner, they could direct OAH to hold another fair hearing or enter a new and different decision consistent with the trial court's ruling. (*Id.* at p. 1532.) The court found OAH would not suffer harm if it were not joined since its only role was to provide a hearing officer and its only interest would be to uphold the ALJ's administrative decision, which interests were amply protected by the real party in interest, whose answer and opposing brief made clear it would vigorously defend the

administrative decision. (*Id.* at pp. 1532–1533.) Nor would the existing parties suffer harm in terms of the judgment being vulnerable to collateral attack, because if the court had entered judgment against the Department, it would have bound OAH as the Department's representative. (*Id.* at pp. 1533–1534.) Thus, according to the *Hayes* court, the matter was unlike *Kaczorowski*, where a judgment against the Board would be vulnerable to collateral attack by the Coastal Commission. (*Hayes*, 138 Cal.App.4th at p. 1533.)

■ The *Hayes* court found its conclusion consistent with a position taken in an administrative mandamus treatise: " 'Ordinarily, a subordinate official or hearing officer should not be named by title or otherwise as a respondent in an administrative mandamus proceeding unless: final decisionmaking authority has been delegated to that subordinate official or hearing officer, *and* the delegating statute expressly provides that the subordinate official or hearing officer be named by title as respondent. Absent such a statute, the appropriate named respondent is the delegating authority.' " (*Hayes, supra,* 138 Cal.App.4th at p. 1532, fn. 3, quoting 1 Cal. Administrative Mandamus (Cont.Ed.Bar 2005) Identifying Respondent and Real Party in Interest, § 8.11, p. 312.) *Hayes* observed that the Lanterman Act provisions implicated in that case that delegated final decisionmaking authority to the hearing officer did not expressly provide that the hearing officer from OAH be named as the respondent. (*Hayes*, at p. 1532, fn. 3.)

### C. *Analysis*

■ The hearing officer's role in this proceeding is defined by the Ordinance, and thus we review its provisions. (*Hayes, supra,* 138 Cal.App.4th at p. 1529.) The conduct of hearings and appeals on applications for special adjustments, as well as the powers and duties of the hearing officer, are set forth in section 16B.15 of the Ordinance. Under that section, "[a] special adjustment decision of the [C]ommission rejecting the application, denying a rent increase, granting a rent increase, or granting a modified rent increase may be appealed to a hearing officer selected in accordance with the provisions in this chapter." (Ord., § 16B.15, subd. (j)(1).) The Commission's staff is obligated to develop and maintain a list of hearing officers compiled from a list of retired judges and justices from California federal and state courts. (Ord., § 16B.15, subd. (j)(2).) The parties are given an opportunity to review the list so as to agree upon a hearing officer and if unable to do so, must narrow down names by coin toss from a panel of five hearing officers designated by the Commission staff. (Ord., § 16B.15, subd. (j)(2).) Following the parties' selection, the hearing officer within specified times receives the complete Commission file, provides notice of the date, place and time of the hearing, and commences the hearing. (Ord., § 16B.15, subd. (j)(4)a, b, c.)

"The hearing officer shall exercise his/her independent judgment as to the 'special adjustment' to be awarded . . ."; he or she "is not bound by the prior determinations, findings, or decision of the [C]ommission"; and the hearing officer's decision "will be a final administrative decision and there shall be no remand to the [C]ommission for further proceedings." (Ord., § 16B.15, subd. (j)(4)d, e, f.) "Any party dissatisfied with the hearing officer's decision may seek judicial review in the superior court." (Ord., § 16B.15, subd. (j)(4)g.)

We are persuaded that the circumstances here are more akin to *Hayes*, *supra*, 138 Cal.App.4th 1523, than *Kaczorowski*, *supra*, 88 Cal.App.4th 564. The finality of the hearing officer's decision is not determinative. (*Hayes*, at p. 1531.) The Ordinance requires the Commission to designate the hearing officers, and in that sense the hearing officer is an agent of City and the Commission, as was the ALJ or OAH a designee of the Department in *Hayes*. As in *Hayes*, the hearing officer's interest in his decision will not go unprotected because City and the Commission here are seeking to uphold it, and they have presented a vigorous defense of that decision. (E.g., *Hayes*, 138 Cal.App.4th at pp. 1532–1533.) City does not identify any particular harm the hearing officer would suffer if the officer is not joined as a party. (*Id.* at p. 1533.) Further, we are not persuaded there is any bar to the Commission's setting aside the hearing officer's decision and directing the officer to hold another fair hearing or enter a new and different decision. City relies upon the provision of the Ordinance providing "there shall be no remand to the [C]ommission for further proceedings" (Ord., § 16B.15, subd. (j)(4)f), however, that clause does not identify a subject, and we do not interpret it as limiting the *superior court's* ability to provide a remedy under Code of Civil Procedure section 1094.5. Because there is a separate provision of the Ordinance addressing judicial review in the superior court (Ord., § 16B.15, subd. (j)(4)g), the subdivision (j)(4)f clause is reasonably interpreted as only circumscribing the hearing officer's powers. Finally, like *Hayes*, the Ordinance here does not provide that the hearing officer be named as a respondent.

Other than comparing this matter to *Kaczorowski*, *supra*, 88 Cal.App.4th 564, City has not meaningfully discussed or applied the distinct clauses of Code of Civil Procedure section 389, subdivisions (a) and (b) addressing necessary and indispensable parties; in particular, it has not addressed whether Owner will have an adequate remedy if the action is dismissed. Thus, City has not convinced us that the superior court abused its discretion in concluding, implicitly, that the matter in equity and good conscience should proceed with the parties before it. (Code Civ. Proc., § 389, subd. (b).) We turn to the merits of City's appeal.

## II. *Determination of Just and Reasonable Return*

### A. *Administrative Mandamus Standards and Appellate Standard of Review*

On a properly filed petition for a writ of mandate under Code of Civil Procedure section 1094.5, a court sitting without a jury is empowered to "inquir[e] into the validity of any [discretionary] final administrative order or decision" made after an evidentiary hearing. (Code Civ. Proc., § 1094.5, subd. (a); see also Code Civ. Proc., § 1094.6, subd. (a) [authorizing "[j]udicial review of any decision of a local agency . . . or of any commission, board, officer or agent thereof . . . pursuant to [Code of Civil Procedure] section 1094.5"].) In such a case, the scope of the court's review is limited to determining, inter alia, "whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b); see *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 216 [130 Cal.Rptr.2d 564].) An abuse of discretion is established if an administrative agency or officer " 'has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Ibid.*; see also *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 33 [112 Cal.Rptr. 805, 520 P.2d 29].)

On appeal, this court reviews not the *trial court's* ruling, but the *hearing officer's* final administrative decision.[3] (*Berger, supra,* 127 Cal.App.4th at p. 7 [addressing standard of review of city rent control board's final administrative decision].) In reviewing the administrative decision, this court must consider whether substantial evidence supports the hearing officer's conclusion that the current rental rates for the Park in this case already provided a fair rate of return. (See, e.g., *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 287 [82 Cal.Rptr.2d 569], citing *Yee v. Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1106 [23 Cal.Rptr.2d 1]; see also *Berger, supra,* 127 Cal.App.4th at

---

[3] Asserting that neither the trial court's factual findings nor the underlying facts at the administrative level are in dispute, Owner argues our review must be de novo. It appears to suggest that this court should apply de novo review to the *trial court's* judgment. Owner cites *Young v. Gannon* (2002) 97 Cal.App.4th 209 [118 Cal.Rptr.2d 187] for the proposition that we are required to review the administrative record in the light most favorable to that judgment. Owner's reading of *Young* as referring to the trial court's judgment is incorrect. The Court of Appeal in *Young* stated that in reviewing the trial court's determination of a writ of administrative mandate brought against the State Personnel Board (Board), "this court's duty is to determine whether the *Board's* decision was supported by the findings and the findings by substantial evidence or whether the *Board* abused its discretion by failing to proceed in the manner required by law." (*Id.* at pp. 224–225, italics added.) We do not read the *Young* court's statement that it would "view the evidence in the light most favorable to the judgment" (*id.* at p. 225) as referring to the trial court's judgment. Hence, we review the hearing officer's decision based on the review standard set forth above.

p. 7; *MHC Operating Limited Partnership v. City of San Jose, supra,* 106 Cal.App.4th at p. 218.) In doing so, we consider all relevant evidence in the administrative record, beginning with the presumption that the record contains evidence to sustain the hearing officer's findings of fact. (*Berger,* at p. 7.) " 'In general, substantial evidence has been defined . . . as evidence of " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' " [citation]; and . . . as " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " ' " (*Ibid.,* quoting *County of San Diego v. Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 555 [195 Cal.Rptr. 895].)

While we apply the substantial evidence review standard to the hearing officer's factual findings, to the extent the hearing officer rested his administrative decision on an interpretation or application of the Ordinance, the matter presents a question of law for our independent review, requiring us to give considerable deference to the hearing officer's interpretation. (*MHC Operating Limited Partnership v. City of San Jose, supra,* 106 Cal.App.4th at pp. 219–220; see *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) "In the particular context of rent control ordinances, '[t]he [hearing officer's] interpretation of an ordinance's implementation guidelines is given considerable deference and must be upheld absent evidence the interpretation lacks a reasonable foundation. [Citation.] The burden is on the [party challenging the hearing officer's decision] to prove the board's decision is neither reasonable nor lawful.' " (*MHC, supra,* 106 Cal.App.4th at pp. 219–220.)

## B. *Fair Rate of Return Standard*

■ Price control regulations, including rent control, "are generally found to pass constitutional muster 'so long as the law does not deprive investors of a "fair return" and thereby become "confiscatory." [Citations.] Determining prices that will provide a fair return "involves a balancing of the investor and the consumer interests." [Citation.] "It is the product of expert judgment which carries a presumption of validity." [Citation.] A reviewing court focuses on whether the regulatory agency took relevant investor interests into account. [Citations.] . . . ["] . . . It is not theory but the impact of the [price regulation] which counts." [Citation.] In sum, when considering whether a price regulation violates due process, a "court must determine whether the [regulation] may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection for the heart of relevant public interests, both existing and foreseeable." ' [Citation.] In other words, rent regulation must not prevent an efficient enterprise from ' " 'operating successfully,' " ' but rent regulators are permitted to adjust prices 'within a

"broad zone of reasonableness,"' balancing the interests of landlords and tenants." (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1021–1022 [103 Cal.Rptr.2d 711, 16 P.3d 130].)

■ This court recently addressed the "fair rate of return" standard as applied in the mobilehome rent control context in *Berger, supra*, 127 Cal.App.4th 1: " 'The term "fair return" is incapable of precise definition [citation], but is generally considered to include returns that are "commensurate with returns on investments in other enterprises having comparable risks" [citation], or "high enough to encourage good management, reward efficiency, discourage the flight of capital, and enable operators to maintain their credit." ' [Citations.] [¶] The term 'fair rate of return' refers 'to a constitutional *minimum* within a broad zone of reasonableness. . . . [W]ithin this broad zone, the rate regulator is balancing the interests of investors, i.e., landlords, with the interests of consumers, i.e., mobilehome owners.' [Citation.] '[A] rent control provision [that] does not permit a just and reasonable return on a landlord's investment is confiscatory.' " (*Berger, supra*, 127 Cal.App.4th at p. 8.)

■ In determining a just and reasonable return, no particular formula or combination of formulas is mandated; the selection of an administrative standard must be left to local governments, not the courts. (*Berger, supra*, 127 Cal.App.4th at pp. 8–9; see *Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284, 672 P.2d 1297].) To satisfy this standard, rent control laws incorporate any of a variety of formulas for calculating rent ceilings. (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 768 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*), citing Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade* (1983) 35 Rutgers L.Rev. 723, 781–817 [discussing various rent control formulas including cash flow, fair return on cash investment/equity, return on value, and maintenance of NOI].) However, "the actual method utilized to regulate rents is immaterial so long as the result achieved is constitutionally acceptable." (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd., supra*, 70 Cal.App.4th at p. 290, citing *Pennell v. City of San Jose* (1986) 42 Cal.3d 365, 370–372 [228 Cal.Rptr. 726, 721 P.2d 1111]; see also *Kavanau*, at p. 768; *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 318 [32 Cal.Rptr.2d 807, 878 P.2d 566] (*20th Century*).) The California Supreme Court emphasized in *Kavanau, supra*, 16 Cal.4th 761, that " '[t]he economic judgments required in rate proceedings are often hopelessly complex. . . . The Constitution is not designed to arbitrate these economic niceties.' [Citation.] Thus, courts do not 'examine[] piecemeal' the 'subsidiary aspects of [a state agency's] ratemaking methodology' [citation], and flexibility in one part of a regulatory scheme

may offset restrictiveness in another." (*Kavanau*, at p. 778, quoting *Duquesne Light Co. v. Barasch* (1989) 488 U.S. 299, 313–314 [102 L.Ed.2d 646, 109 S.Ct. 609].)

Given these standards, judicial inquiry as to whether or not a rate is just and reasonable " 'is at an end' '[i]f the *total effect* of the rate order cannot be said to be unjust and unreasonable . . . . The fact that the method employed to reach that result may contain infirmities is not then important.' [Citations.] '[H]e who would upset the rate order . . . carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' " (*20th Century*, *supra*, 8 Cal.4th at pp. 318–319, italics added.) Regulations that enable the company to operate successfully cannot be condemned as invalid, even though they might produce only a meager return. (*20th Century*, at p. 295.)

## C. *Presumption and Evidentiary Burden Under the Ordinance*

Our resolution of the issues presented by this appeal requires an understanding of the evidentiary burden placed upon an applicant for a special adjustment under the Ordinance, which burden City contends was not met by Owner. As the hearing officer expressly recognized during the administrative hearing and in his decision, the Ordinance contains an express presumption: At the "fair return hearing" in which Owner sought a special adjustment (Ord., § 16B.10, subd. (d))—an adjustment calculated differently from those already provided for in the Ordinance—the Ordinance specifies "the park owner shall bear the burden of presenting evidence rebutting the presumption stated in subsection 16B.10, subd. (c) herein," that is, that "the adjustments provided for in this chapter, including any adjustments to base year NOI and any annual adjustments or pass-thru adjustments, provide all adjustments necessary to allow the park owner a just and reasonable return on investment for any given year." (Ord., § 16B.10, subds. (e), (c).) Thus, the Ordinance required Owner as a threshold matter to present evidence demonstrating that neither the annual permissive adjustment, equivalent to the lesser of 75 percent of the increase in the CPI or 8 percent (Ord., § 16B.9, subd. (c)(1)), nor the alternative adjustment based on the Park's NOI (gross income less operating expenses) (Ord., §§ 16B.9, subd. (c)(2), 16B.12, also referred to as maintenance of net operating income or MNOI) would result in a just and reasonable return.[4] In making its determination at the hearing, the

---

[4] The Oceanside City Council's "Administrative Procedural Guidelines and Forms for the Administration and Enforcement of the Manufactured Home Fair Practices Act" (Procedural Guidelines), address this presumption, providing: "[A]t the fair return hearing, the park owner carries a heavy burden to prove to the Commission that under circumstances unique to the park and the park owner, the permissive, NOI, and pass-thru adjustments of the Ordinance are inadequate."

Commission considers the park owner's evidence as well as other evidence required by the Ordinance,[5] determines whether the other adjustments provided for in the Ordinance allow a park owner a just and reasonable return on investment, and proceeds to decide whether and to what extent a special adjustment is necessary to allow such a return. (Ord., § 16B.10, subd. (e).)

Owner declined to recognize this presumption on its request for a special adjustment at the fair return hearing. In its counsel's letter supporting its request for a special adjustment, Owner challenged application of the Ordinance's presumption on grounds it was "improper as a matter of law." Citing *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 698 [209 Cal.Rptr. 682, 693 P.2d 261], Owner maintained a local ordinance "may not 'alter the preponderance of evidence burden of proof' " and that an ordinance would be void to the extent it purported to lay down rules of evidence. Owner argued: "Thus, the City may not start with the presumption that the existing structure of annual increases is sufficient. In fact, based on the structure of the Ordinance, it may fairly be presumed that over time, the park owner will be deprived of a fair return and the Ordinance will cause a taking unless a Special Adjustment is granted." Owner does not repeat its challenge to the presumption in its response to City's arguments on appeal.

 The interpretation and legal effect of the Ordinance is a pure question of law; the rules of construction applying to statutes apply equally to ordinances. (*Berger, supra,* 127 Cal.App.4th at p. 12.) Contrary to Owner's position before the Commission, we conclude the Ordinance creates a presumption affecting the burden of *producing evidence*, not one affecting the burden of proof. This distinguishes Oceanside's Ordinance from the retaliatory eviction provision of the ordinance found invalid in *Fisher v. City of Berkeley, supra,* 37 Cal.3d at pages 653, 694–696, which the court held was a presumption affecting the burden of proof preempted by the Evidence Code.

---

[5] The Ordinance requires the Commission at the fair return hearing to consider all relevant and available evidence including but not limited to: "a. Changes in the [CPI]; [¶] b. Rent for comparable mobilehome spaces in the City of Oceanside; [¶] c. The length of time since the last rent increase or rent adjustment; [¶] d. Capital improvements made to the park and the costs for such improvements; [¶] e. Changes in property taxes or other assessed taxes to the park; [¶] f. Rent paid by park owner/applicant for leased land; [¶] g. Changes in utility charges or rates; [¶] h. Changes in reasonable operating and maintenance expenses; [¶] i. The need for repairs caused by circumstances other than ordinary wear and tear; [¶] j. The amount and quality of services and amenities provided by the park owner/applicant to the residents of the park; [¶] k. The park owner/applicant's investment, additional investments, appreciation, depreciation, and possible tax benefits; and [¶] l. Any particular hardship circumstances of the park owner/applicant or the residents." (Ord., § 16B.15, subd. (d)(7), italics added.) The subdivision further provides: "It shall be the responsibility of the applicant for a special adjustment to provide any such evidence available to him or her upon request by the [C]ommission." (*Ibid.*)

(*Id.* at pp. 696–698.)[6] Having concluded such a provision concerning the burden of proof was void as in direct conflict with Evidence Code section 500, the court expressly reserved decision on the "separate issue" of whether "the Evidence Code directly or by implication preempts a local ordinance that purports to create a presumption shifting the burden of producing evidence . . . ." (*Fisher, supra,* 37 Cal.3d at p. 698.) *Fisher* does not invalidate the burden of producing evidence set forth in the Ordinance before us.

*Fisher* explains the nature of a presumption affecting the burden of producing evidence: "The burden of producing evidence refers to a party's obligation to introduce evidence sufficient to establish a prima facie case, or, in other words, sufficient to avoid nonsuit. (Evid. Code, § 110.) 'A presumption affecting the burden of producing evidence is a presumption established to implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied.' (Evid. Code, § 603.) The code makes clear that the purpose of such a rebuttable presumption relates solely to judicial efficiency, and does not rest on any public policy extrinsic to the action in which it is invoked. A presumption affecting the burden of producing evidence is based on an underlying logical inference that the presumed fact very likely follows from the proved fact; the presumption is designed to avoid unnecessary proof of facts likely to be true if not disputed. Especially relevant to the present case, such a rebuttable presumption is designed to place the responsibility for establishing the nonexistence of certain facts on the party most able to do so." (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 694.)

Evidence Code section 604 provides: "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trial of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate."

---

[6] In *Fisher,* the provision in the Berkeley ordinance created a presumption that a landlord's act in recovering possession was retaliatory, upon proof that the tenant's assertion of rights occurred within six months prior to the alleged act of retaliation. (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 693 & fn. 54.) The Berkeley ordinance stated: " ' "Presumption" means that the Court must find the existence of the fact presumed unless and until *its nonexistence is proven by a preponderance of the evidence.*' " (*Id.* at p. 693, fn. 54.) It had been amended to insert the italicized language in place of the previously used phrase, " 'unless and until evidence is introduced which would support a finding of its nonexistence.' " (*Id.* at p. 693.) The *Fisher* court concluded that the preamendment language set forth a presumption affecting the burden of producing evidence, but that the amended language amounted to a presumption affecting the burden of proof.

D. *Owner's Evidence Did Not Rebut the Ordinance's Presumption That Application of Annual CPI Increases or the NOI Adjustment Results in a Just and Reasonable Return*

City contends Owner's evidence was insufficient to rebut the presumption set out in the Ordinance because its expert appraiser Neet did not address the Park's actual rate of return or the rate of return being earned by investments with commensurate risks and benefits, nor did any of Owner's other evidence address these questions at the fair return hearing. City asserts Neet's information in fact confirmed the conclusion of its own expert, Dr. Gibson, that 9 percent is a fair return, because Neet's analysis of assertedly comparable mobilehome parks showed a lesser overall rate of return of 7.75 percent, whereas Gibson found the Park was earning a 10 percent return. Citing *20th Century, supra,* 8 Cal.4th at pages 297–298, City argues that to establish a denial of fair return, Owner bears a heavy burden of showing deep financial hardship or that it cannot operate successfully.

Owner responds that City has misstated the burden of proof. It argues *20th Century* is an inapposite insurance case; that it does not bear such a heavy burden, but even if it did, it met that standard because there was "undisputed evidence establishing that . . . City's application of the Ordinance resulted in a 75 percent erosion of return from the commencement of rent control from 1980." Further, Owner maintains that, contrary to City's contention, it presented a return on investment methodology "using the initial purchase price as the base investment and rel[ying] on the same evidence regarding income and expenses for three years prior to the application." Owner neglects record citations for these propositions, although we note such assertions were made by Owner's counsel in letters submitted to the Commission and hearing officer.

Our analysis of City's contention requires a closer examination of Owner's showing at the fair return hearing before the hearing officer, including the reports and testimony of its witnesses and the other evidence produced by Owner.

1. *John Neet*

Appraiser John Neet's appraisal report estimated that as of January 2004, the market value of the Park was $2.15 million. At the fair return hearing, Neet testified about the underlying rental comparison he had prepared for his analysis, and also expressed criticism about Dr. Gibson's methodology, pointing out Gibson's analysis was based on the "original investment less depreciation plus capital improvements." Neet said, "I personally have been involved in appraisal of commercial real estate for

20-some-odd years. I did not come across this system until the first time I heard [Dr.] Gibson present it at a rent control hearing. It is not something that is relied upon by the market. The market uses as a base of investment not the depreciated book value but the market value of the investment and the amount of equity that could be obtained in the investment if it were to be sold." Neet discussed generally the concepts of rates of return, stating "in the market today a return on property in property value can be found in the [10] to 15 percent range" and a return on equity would be higher. Answering counsel's questions, Neet testified that a reasonable rent level, based on a "noncoercive" transaction, would be $475 on the current expense basis. Neet testified generally that Dr. Gibson's method using depreciation would decrease a park owner's return from year to year, causing a decrease in value.

### 2. *August 31, 1999, Letter from Assistant County Counsel to County of Santa Cruz Board of Supervisors*

Owner submitted to the Commission an August 31, 1999, letter to the Board of Supervisors of the County of Santa Cruz, in which an assistant county counsel reported the Santa Cruz County Mobilehome Commission's recommendation that 12 percent was the reasonable rate of return on capital improvements as permitted by a specific subsection of a Santa Cruz Ordinance.[7] Owner relied upon this data to argue to the hearing officer that "the City of Santa Cruz officially adopted a 12 [percent] return rate for the purposes of its rent control law."

### 3. *Daniel Curren*

Owner presented testimony from Daniel Curren, a licensed real estate broker and certified business appraiser. Like Neet, Curren addressed and criticized Dr. Gibson's use of the depreciated book value of the property's total assets as the base on which to calculate the fair return, stating it was unreasonable to take a return on essentially the same price that was paid for the property 24 years ago. Curren proposed that what made more sense was

---

[7] In part, that letter provides: "Subsection 13.32.030(d)(4) of the Mobilehome Rent Adjustment Ordinance provides that the annual automatic general rent adjustment for a mobilehome park may, subject to specified exceptions, include a pass-through of 50 percent of the costs of a capital improvement, amortized over a ten-year period, together with an allowance of a rate of return, at a percentage established annually, on the balance of the cost. The Ordinance further provides that any park owner contending that the general rent adjustments do not provide a fair and reasonable return on investment may file a petition for a special rent adjustment. [¶] . . . [¶] After public hearing at its meeting of August 26, the Mobilehome Commission voted unanimously to recommend that the reasonable rate of return remain at the existing rate of twelve percent (12) . . . [¶] IT IS THEREFORE RECOMMENDED that your Board accept and adopt the recommendation of the Mobilehome Commission that the reasonable rate of return for qualified mobilehome park capital improvements remain at twelve percent (12)."

to apply a return to the original purchase price indexed for inflation. Curren also criticized Dr. Gibson's use of the Almanac, pointing out it reflected data from private companies that seek to drive down profitability for tax reasons, and also used public company tax return information for companies much larger and not comparable to the Park. He felt many of the companies contained in the data set used by the Almanac and Dr. Gibson such as nonresidential building operators, retail establishments and auditoriums, theaters, piers, and docks were not comparable to the Park and he observed the data was from entities geographically dispersed across the country.

Curren testified that based upon his review of different sources containing sales comparables, mobilehome park owners across the country had an expected rate of return between 14 and 17 percent. According to Curren, Dr. Gibson made a fatal flaw by omitting interest expense in his return on assets calculation for the Park, when the Almanac data used net income before taxes but after interest expense. Finally Curren criticized Dr. Gibson for excluding an offsite management fee in his analysis, which Curren calculated to be approximately 3 percent of the Park's total revenue.

### 4. *Jeff Leek*

Jeff Leek, who was with the professional management company Star Management, explained the duties and advantages to Owner of its services.

### 5. *Excerpt from Kenneth Baar Presentation*

Owner's counsel played an excerpt from a training session conducted by Dr. Kenneth Baar, in which Dr. Baar stated that when he prepared reports for cities, he often would conduct an MNOI analysis and also a "return on investment" analysis, explaining that in his return on investment analysis, "I will index the historic investment because I think otherwise it doesn't make sense." Owner used this excerpt to again attack Dr. Gibson's analysis.

 We agree with City that the foregoing evidence did not operate to rebut the Ordinance's presumption that application of the rate formulas contained within its provisions provides a just and reasonable rate of return. Critical to our conclusion is the fact that this court long ago determined that the Ordinance's provisions are not facially unconstitutional, i.e., that the use of CPI adjustments and NOI adjustments "assures a just and reasonable return under general market conditions." (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra,* 157 Cal.App.3d at p. 905, italics &

capitalization omitted.)[8] "By permitting park owners to adjust their rents based upon a percentage rental increase equal to the percentage increase in the CPI or 8 percent whichever is lower, or an increase to insure his NOI or profit is increased by a percentage equal to the lesser of the housing component of the CPI or 40 percent of the CPI, the ordinance permits the NOI to be adjusted upward to account for inflation. Because the CPI is a statistical snapshot of general market conditions, this ordinance essentially permits park owners to obtain a just and reasonable return under general marketing conditions in any given year." (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra,* 157 Cal.App.3d at p. 902.) "[E]mploying the [NOI] standard to guarantee park owners a fair NOI is facially constitutional. The Oceanside ordinance permits park owners to adjust for inflation to maintain the same NOI they enjoyed in the rental market before rent control. It insures the NOI established for a park owner is fair by permitting him to adjust it to a level equal at least to 50 percent of his gross operating income during the base year." (*Id.* at p. 903; see also *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168, 1178 [55 Cal.Rptr.2d 282] [pointing out numerous courts have acknowledged that the MNOI approach is constitutionally valid even where an ordinance ignores certain expenses incurred by landlords].)

At the fair return hearing, the Ordinance required Owner to operate under the presumed fact that City's chosen CPI and NOI methods, *as applied to it,* would provide a constitutionally acceptable return, i.e., that they would not be confiscatory by depriving investors of a "fair return." (See Ord., § 16B.10, subds. (c), (d); *Kavanau, supra,* 16 Cal.4th at p. 771.) To rebut this presumed

---

[8] We explained the Ordinance's NOI maintenance formula in *Oceanside*: "The FNOI [fair net operating income] standard is 'designed to guarantee landlords at least the same rate of return, *with adjustments for inflation,* they experienced prior to the enactment of rent control. This approach is termed the 'maintenance of profit approach,' 'historic return approach,' or 'fair operating income approach.' Pursuant to [applicable] . . . guidelines, . . . [the Commission] may grant increases in rent where the maximum rent or adjusted maximum rent allowed to a landlord under the ordinance does not constitute a just and reasonable return. A just and reasonable return under the guidelines is that level of rent necessary to enable the landlord to maintain the same net profit as obtained in the last year there was an unregulated housing market.' [Citation.] . . . [T]he Oceanside ordinance provides an automatic or permissive adjustment formula permitting the rent to be increased by a certain percentage, or an adjustment determined by the profit maintenance formula which permits the raising of the NOI by a certain percentage." (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra,* 157 Cal.App.3d at pp. 902–903, italics added.) Use of the NOI standard " 'avoids the primary failure of the cost-of-living increase system in that it distinguishes between increasing costs of operation and fixed costs of mortgage principal and interest . . . . [¶] [Moreover] this standard gives an owner the incentive to spend money to properly maintain his property. Assuming those costs are reasonable, they will be paid from rental income and will be considered in computing an increase in net operating income.' " (*Oceanside, supra,* at p. 903, quoting Note, *Rethinking Rent Control: An Analysis of "Fair Return"* (1981) 12 Rutgers L.J. 617, 647.)

fact, Owner was obligated to present some evidence demonstrating that when applied to the Park, the CPI adjustments and the NOI adjustment failed this standard.[9] Yet, Owner did not address its income during the 1984 base year (see Procedural Guidelines, § 5.05; e.g., *Palomar, supra,* 16 Cal.App.4th at pp. 486–487 [if San Marcos ordinance at issue had established a prerent control base year that was presumed to have provided the park owner with a fair return, the debate on whether an MNOI formula gave a fair return could have focused on Palomar's income during the base year]), and none of its witnesses attempted to undertake a CPI or NOI analysis. Thus, we cannot conclude Owner demonstrated that the returns that these standards provided (or would have provided, in the case of the NOI adjustment which accounts for inflation by indexing base year NOI by 40 percent) are so unreasonable and unfair as to be confiscatory.

Some city ordinances specify the type of evidence that would tend to rebut a presumption that an NOI adjustment provides a landlord with a fair return, similar to that established by the Ordinance here. *Kavanau, supra,* 16 Cal.4th 761, sheds light on the nature of such evidence. Like the Ordinance here, Santa Monica's rent board regulations established a presumption that the NOI during the base calendar year (there, 1978) provided the landlord with a fair return. (*Kavanau,* at p. 769.) The landlord was also permitted to petition for rent increases that, like the Ordinance here (Ord., § 16B.9) would increase NOI at a rate equal to 40 percent of any increase in the CPI. (16 Cal.4th at pp. 769–770.) The regulations provided that a landlord could rebut the aforementioned presumption by showing that operating expenses in 1978 were unusually high or that base rent was unusually low. (*Id.* at p. 770.) Or, to establish an erosion of NOI and entitlement to a rent increase, a landlord could present evidence of an increase in operating expenses, including capital improvement costs as long as those costs were amortized over their useful life under an amortization schedule. (*Ibid.*) Though we take note of the provisions of the Santa Monica regulations, we do not express an opinion about the type and nature of evidence that must be presented to rebut the Ordinance's presumption; for purposes of our holding here, it is sufficient to state that Owner's evidence as described above did not rebut the presumed fact established in the Ordinance. That City may or may not have produced evidence reflecting on these issues does not alter the evidentiary presumption contained in the Ordinance.

Rather than presenting evidence tending to show the Ordinance as applied to it would result in a confiscatory rate of return, Owner presented an

---

[9] We note Owner could have avoided its evidentiary burden under the Ordinance by demonstrating that its NOI was less than 50 percent of its gross income in the base year. (Ord., § 16B.10, subd. (b) ["It shall be presumed that where the NOI is less than fifty (50) percent of gross income in the base year, the park owner was receiving less than a just and reasonable return on the manufactured home park"].)

alternative formula different from the CPI and NOI standards; it advocated using Neet's market valuation of the Park as the base on which to calculate a fair return. "[T]he return on value standard determines fair return by focusing on the market value of the landlord's property." (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 680, fn. 33.) It appears to us that this is a "return on value" approach that we and other courts, including the California Supreme Court, have expressly rejected as unworkable. (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra,* 157 Cal.App.3d at p. 902.) Citing *Power Comm'n v. Hope Gas Co.* (1944) 320 U.S. 591, 601–602 [88 L.Ed. 333, 64 S.Ct. 281], we explained that " ' "[t]he fixing of prices, like other applications of police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. [Citations.] It does, however, indicate that 'fair value' is the end product of the process of rate making not the starting point . . . . The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated." ' " (*Oceanside, supra,* 157 Cal.App.3d at p. 899; see also *Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 680, fn. 33 [expressly agreeing that the circularity problem exists when fair market value concepts are applied in the rent control context; "Implicit in [*Hope Gas*] is the suggestion that a return on fair value standard is circular and unworkable"]; see *Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd.* (1994) 30 Cal.App.4th 84, 92, fn. 4 [35 Cal.Rptr.2d 315]; *Yee v. Mobilehome Park Rental Review Bd., supra,* 17 Cal.App.4th at p. 1104; *Baker v. City of Santa Monica* (1986) 181 Cal.App.3d 972, 979–980 [226 Cal.Rptr. 755]; *Cotati Alliance for Better Housing v. City of Cotati* (1983) 148 Cal.App.3d 280, 291 [195 Cal.Rptr. 825].)[10]

Owner maintains it did not advance a return on value methodology; it argues it advocated a return on *investment* approach starting with its original, prerent control purchase price ($1.2 million) and adjusting it for inflation. The argument, however, misses the point. In view of the presumption established by the Ordinance, it is not sufficient for Owner to attack City's showing or argue that a different formula will provide a fair return. As stated, it must first

---

[10] "The current 'value' of a rental property . . . depends in large part on the amount of rental income the property is expected to generate. As in the utility rate cases, the process of using value to determine what rental income shall be permitted becomes circular. [Citations.] . . . 'The fatal flaw in the return on value standard is that income property most commonly is valued through capitalization of its income. Thus, the process of making individual rent adjustments on the basis of a return on value standard is meaningless because it is inevitably circular: value is determined by rental income, the amount of which is in turn set according to value. Use of a return on value standard would thoroughly undermine rent control, since the use of uncontrolled income potential to determine value would result in the same rents as those which would be charged in the absence of regulation. Value (and hence rents) would increase in a never-ending spiral.' " (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 681, fn. 33.)

make its own threshold evidentiary showing that the formulas provided for by City's Ordinance are unjust and unreasonable in their consequences.

### III. Owner's Cross-appeal

#### A. Claimed Inconsistent Use of Income-tax-based Data

As stated, Dr. Gibson calculated the Park's return on estimated assets for three calendar/fiscal years: 2001, 2002 and 2003, by calculating the returns for each year and also for the three-year average. Dr. Gibson divided the Park's estimated net income before interest and taxes with its estimated total book assets. He compared the Park's return on assets for those three years with 2001 benchmark indices from the Almanac (published in 2004), consisting of Internal Revenue Service data on United States corporations including lessors of buildings, real estate operators, condominium management and operators of residential mobilehome sites.[11] The Almanac benchmark Dr. Gibson used was 9 percent for the 74-space park, and 10.40 percent for the 60-space park. The hearing officer found Dr. Gibson's data a reliable indicator of return rates: ". . . Dr. Gibson's 9 [percent] rate of return on net income before deduction of taxes and interest is a reliable rate of return to apply to this regulated industry. To first deduct debt service as an expense to arrive at a rate of return would be to reward a park owner for taking out all equity by way of periodic refinancing, leaving the tenants to absorb the cost in a rent increase. This result is specifically prohibited by the [O]rdinance."

Owner contends Dr. Gibson inconsistently used income-tax-based data from the Almanac, rendering Gibson's comparison of that data and the Park's return "invalid" and causing his opinion to be erroneous as a matter of law. Owner explains it "does not challenge the use of the Almanac/tax data or the 9 [percent] return rate *per se*," rather, it maintains "Dr. Gibson did not apply the data or his method consistently and thereby substantially overstated TG's return." Owner argues that because the Almanac data included a deduction for interest expense to determine gross profit for the companies within the data set used by Dr. Gibson, Gibson should have also permitted a deduction for the Park's interest expense to render his expert opinion reasonably reliable

---

[11] Dr. Gibson's report states: "For 1999, 2000, and 2001, the Almanac ratios are for the new North American Industry Classification System (NAICS) Code 53115, or 'lessors of buildings' (equivalent to the IRS Internal Service Classification Codes 6511 and 6530). As before, this group classification includes real estate operators (except developers) and lessors of buildings. The group also now has been expanded to include condominium management and cooperative housing. Operators of residential mobile home sites are part of the current Almanac data set through this equivalency. [¶] This Almanac data continues to be the best benchmark available to use for our return on assets calculation. As shown in Exhibit 5, this data set has been continuous and highly stable over the 13-year period of time from 1989 to 2001, averaging 10.96 percent."

and admissible under *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc.* (2000) 85 Cal.App.4th 1042 [102 Cal.Rptr.2d 673] (*Westrec*) and *Kelly-Frye* principles. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013; see *People v. Leahy* (1994) 8 Cal.4th 587, 611 [34 Cal.Rptr.2d 663, 882 P.2d 321] [referring to test as the "*Kelly* test"].) As we understand these arguments, Owner's challenge is to the foundation for Dr. Gibson's conclusions, and thus the reliability and admissibility of his expert opinion testimony.

*Westrec* sets forth the appropriate review standard on this claim. " ' " 'The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " ' " (*Westrec, supra,* 85 Cal.App.4th at p. 1051.) The abuse of discretion review standard applies not only to the expert's qualifications, but also to the trier of fact's decision on the reliability of expert opinion testimony. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618–620 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People v. Rowland* (1992) 4 Cal.4th 238, 266 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Disputes regarding the reliability of hearsay on which an expert relies "must generally be left to the trial court's sound judgment." (*People v. Montiel* (1993) 5 Cal.4th 877, 919 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) However, "[t]he conclusion that a certain legal principle, like the *Kelly-Frye* rule, is applicable or not in a certain factual situation is examined independently." (*Rowland,* at p. 266.)

 We conclude Owner has not shown the hearing officer manifestly abused his discretion in admitting Dr. Gibson's opinion based upon the Almanac data and considering it on the fair return issue. As a threshold matter, on our independent review, we conclude the *Kelly-Frye* rule does not apply. Under *Kelly,* the admissibility of expert testimony based on a new scientific technique requires proof of the technique's reliability, that is, its "general acceptance" in the particular field to which it belongs. (*People v. Kelly, supra,* 17 Cal.3d at p. 30; *People v. Leahy, supra,* 8 Cal.4th at p. 594.) But Owner has not shown Dr. Gibson's reliance on the Almanac data is either a scientific technique, or new. (*People v. Ward* (1999) 71 Cal.App.4th 368, 373 [83 Cal.Rptr.2d 828] [*Kelly-Frye* applies to cases involving novel devices or processes, not to expert medical testimony, such as a psychiatrist's prediction of future dangerousness or a diagnosis of mental illness].)

 Nor can we conclude the hearing officer clearly abused his discretion in accepting Dr. Gibson's approach in applying the Almanac data as reliable and trustworthy. In *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523–1524 [3 Cal.Rptr.2d 833], we explained that "when expert witnesses are called to testify to 'assist the trier of fact,' [citation], the courts have

interpreted the Evidence Code to permit some latitude to experts in utilizing sources of information in forming an opinion. [Citations.] Although the courts have rejected expert opinions '[w]here the basis of the opinion is unreliable hearsay,' [citation], nevertheless, hearsay information of a type reasonably relied upon by professionals in the field in forming an opinion on the subject may be used to support an expert opinion, even though not admissible in court." (Italics omitted.)

Faced with Owner's arguments as to the unreliability of Dr. Gibson's method, the hearing officer adopted Gibson's conclusion that the Almanac data was sufficiently comparable to permit its use as a benchmark for the Park's return on assets data, resulting in the finding that 9 percent was a reliable rate of return to apply to the regulated industry. The hearing officer noted City's concern that the data be put in context: "[C]ounsel for Staff notes that [Owner] provided no other competent rate of return information and, thus, one needs to look at Dr. Gibson's testimony in context. What Dr. Gibson was saying is that the Almanac benchmark for rate of return is really 2.3 [percent] for all corporations, with and without income. When one adds back interest as an expense item, the resulting rate of return would be 6 [percent]. [Dr. Gibson] used 9 [percent], essentially bending over backwards to give the park owner here the highest justifiable rate of return."[12] The hearing officer concluded implicitly, if not explicitly, that Dr. Gibson's reliance on and application of the Almanac's benchmark data, which as Gibson noted, included mobilehome park operators, was not so unreliable or untrustworthy as to render his expert opinion inadmissible. The circumstances are unlike those presented in *Westrec* in which the court exercised its discretion to exclude an expert's testimony concerning lost anticipated profits; that testimony related to insurance coverage for marinas, but the expert's opinion was based on data pertaining to insurance programs offered in enterprises other than marinas and the expert had not surveyed any marinas to determine the percentage of boats insured through their programs. (*Westrec, supra,* 85 Cal.App.4th at pp. 1050–1051.) Under the circumstances, the appellate court concluded the trial court was within its wide latitude in excluding the expert as unqualified because his conclusions did not meet a test of reasonable reliability. (*Ibid.*)

Other than asserting the hearing officer's conclusion "misses the point" because Owner was not challenging whether interest should be included or excluded, Owner has not convinced us that the hearing officer's adoption of Dr. Gibson's data and analysis is so outside the bounds of reason as to constitute an abuse of discretion. (*Kolender v. San Diego County Civil Service Com.* (2007) 149 Cal.App.4th 464, 471 [57 Cal.Rptr.3d 84].)

---

[12] As we understand Dr. Gibson's analysis, Owner would need only show its return was something less than 9 percent to demonstrate it was not receiving a sufficient return compared to the relevant industry.

B. *Use of Rent-control-exempt Revenue*

The hearing officer concluded that in performing a financial analysis for purposes of determining fair return, the trier of fact was required to consider the business as a whole, i.e., include in gross income the revenue generated from all 74 spaces in the Park, including 14 spaces that are exempt from rent control. Relying upon *Morgan v. City of Chino* (2004) 115 Cal.App.4th 1192 [9 Cal.Rptr.3d 784] and *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.*, *supra*, 70 Cal.App.4th 281, the hearing officer reasoned: "Attempting to segregate out both income and related expenses for the unregulated spaces would create an accounting nightmare. Apportioning expenses would be highly subjective and difficult to verify. In any event, such an apportionment was not presented to the Commission. Accordingly, an upward adjustment of rent for the segregation of exempt home revenue is respectfully denied."

Owner contends there is no evidence to justify the inclusion of rent-control-exempt revenue from the 14 spaces to determine fair rents. It argues that doing so provides a subsidy or windfall for tenants living in the Park, contrary to the Ordinance's purpose to protect tenants from unreasonable rent increases. Owner asserts the hearing officer's decision is not supported by any relevant, logical finding.

City responds first that Owner's contention is a "non-issue" on this appeal because while the hearing officer disagreed with Owner's proposed approach of calculating the Park's operating expense on only the 60 rent-controlled spaces, he nevertheless exercised his discretion to adopt Dr. Gibson's recommendation to increase the Park's rents by $10.07 per space, per month, which was based on the 60-space rent-controlled park. City further responds that the concept of calculating operating income on the Park as a whole is entirely acceptable and supported by the authorities relied upon by the hearing officer.

■■■ We agree, in view of our resolution of this appeal, Owner's challenge is moot given the hearing officer's ultimate decision granting a rent increase in accordance with Dr. Gibson's recommendation, which was based upon calculations treating the Park as including only the 60 rent-controlled spaces. An appellate court will not review questions that are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way. (*Keefer v. Keefer* (1939) 31 Cal.App.2d 335, 337 [87 P.2d 856].) The duty of an appellate court is to decide actual controversies and not to give opinions on moot questions or abstract propositions, or to declare principles of law that cannot affect the matter at issue in the case before it. (*In re Audrey D.* (1979) 100 Cal.App.3d 34, 39, fn. 4 [160 Cal.Rptr. 802].)

## DISPOSITION

The judgment is reversed with directions that the court issue an order denying TG Oceanside, L.P.'s petition for writ of mandate. The parties shall bear their own costs on appeal.

Benke, Acting P. J., and Haller, J., concurred.

A petition for a rehearing was denied November 16, 2007, and the opinion was modified to read as printed above.