[No. E032414. Fourth Dist., Div. Two. Feb. 20, 2004.]

BEVERLY C. MORGAN, Plaintiff and Respondent, v.
CITY OF CHINO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the last three paragraphs of the Discussion.

## COUNSEL

Pollak, Vida & Fisher, Girard Fisher and Daniel P. Barer for Defendant and Appellant.

Richards, Watson & Gershon and Rochelle Browne for the Cities of Carson, Los Gatos, Redlands, Redondo Beach, San Francisco, San Luis Obispo and West Hollywood as Amici Curiae on behalf of Defendant and Appellant.

Law Offices of Richard Pech and Richard Pech for Plaintiff and Respondent.

## OPINION

**McKINSTER, J.**—The City of Chino (city) appeals from a judgment awarding Beverly C. Morgan (Morgan) damages and granting her a writ of administrative mandamus based on the city council's refusal to grant a rent increase to compensate Morgan for a capital improvement to the streets of her mobilehome park. The judgment was based on the trial court's conclusion that the council was required by due process and its own rent control ordinance to permit a rent increase sufficient to allow Morgan to both recoup the cost of and earn a fair return on the capital improvement. We disagree with this legal conclusion and reverse the judgment in its entirety. Due process and the city's rent control ordinance merely required the council to take the capital improvement into account when determining whether Morgan was earning a fair return on her investment in the park as a whole. The council properly applied that standard and rejected the requested rent increase because Morgan never provided the evidence necessary to calculate her overall rate of return.

STATEMENT OF FACTS

### 1. Rent Control Ordinance

This case involves the Chino mobilehome park rent control ordinance, which was intended to "protect the residents of mobilehomes from unreasonable space rent increases, recognizing the need of mobilehome park owners to receive a fair return on their investment and revenue sufficient to cover any increased costs of repairs, maintenance, insurance, upkeep and additional amenities." (Former Chino Mun. Code, § 2.68.010, subd. (D).) To that end, the ordinance created a "Mobile Home Park Review Committee" and authorized the committee to hold public hearings on any petition concerning space rents. (*Id.*, §§ 2.68.030–2.68.040, 2.68.060.) The committee was instructed to "consider all relevant factors, including, but not limited to, increased or decreased costs to the mobilehome park owner attributable to utility rates, property taxes, insurance, advertising, governmental assessments, cost of living increases attributable to incidental services, normal repair and maintenance, capital improvements, and the upgrading and addition of amenities or services, as well as a fair rate of return on investments." (*Id.*, § 2.68.060, subd. (E).) The committee was required to "forthwith submit its findings and recommendations to the council." (*Id.*, subd. (B).) Based on those findings, the council was permitted to "require the owner to reduce, increase, maintain, or modify the space rent." (*Id.*, subd. (C).)[1]

### 2. Petition for a Rent Increase

In May 1995, Morgan petitioned the committee for a temporary rent increase of $12.26 per month for five years to recover the cost of repairing the roads and installing a Petromat system to make the roads more durable.[2] In July 1996, after several hearings, the committee adopted a resolution recommending that the council grant a temporary rent increase of $8.53 per month for eight years. The resolution contained various findings of fact, including that the Petromat was a capital improvement, the Petromat cost approximately $150,000, the Petromat is properly amortized over a period of eight years, and 9.25 percent per annum would be a reasonable rate of return on the Petromat.

---

[1] After this case was filed, Chino substantially revised its mobilehome park rent control ordinance to correct many of the problems that gave rise to this case. Our discussion in this opinion is limited to the former ordinance.

[2] Petromat is a product of Phillips Fibers Corporation, a subsidiary of Phillips Petroleum Company. Promotional materials describe the Petromat system as a polypropylene fabric saturated with asphalt from the tack coat and placed beneath the surface layer of asphalt. The Petromat allegedly protects the subgrade from water intrusion, retards and reduces pavement cracking, and improves the pavement fatigue life.

The council was not satisfied, however, and remanded the matter to the committee with specific instructions to, among other things, "[d]etermine [Morgan's] actual return on [her] investments in the park, including the interior streets" and "[d]etermine whether [Morgan's] return on [her] investments in the park is a fair rate of return[.]"

As a result of the remand, the committee held further hearings and adopted a second resolution reporting its additional findings in March 1998. Among other things, the committee found that Morgan had not yet received a return on the Petromat investment and reiterated that 9.25 percent per annum was a reasonable rate of return on the Petromat.

In April 1998, the council members challenged the committee's additional findings and expressed dismay at the committee's failure to answer the specific questions that were asked. Regardless, the city attorney advised the council that there was no basis to deny the rent increase, and that a denial could lead to legal action resulting in an order to approve the rent increase, plus liability for the costs of the Petromat, attorney fees, and damages. Following that warning, a council member moved to validate the committee findings, but there was no second, so the motion died. After further discussions about the inadequacy of the committee findings, another council member moved to deny the rent increase based on lack of evidence. That motion was seconded and reportedly carried on a three-to-one vote. However, at the conclusion of the meeting, it was discovered that the reported vote of three-to-one was incorrect, that the vote was actually two to two. As a result, the motion was continued for reconsideration at the next meeting in May.[3]

At the meeting in May, a council member asked whether the council could find that the committee hearing was flawed. The city attorney responded that although he did not think the committee hearing was flawed, the council could conclude that the committee failed to answer the council's questions on remand and could therefore conduct further hearings on those limited issues. The council concluded that the committee had erred in part by limiting its responses to the return on the Petromat as opposed to the return on all the "investments" in the park. The council unanimously rejected the inadequate committee findings and scheduled a council hearing to obtain additional evidence on those issues.

At the next hearing a few weeks later, the council received additional evidence from Morgan and the renters and unanimously denied the requested rent increase. Among other things, the council found: "[The ordinance] does

---

[3] A subsequent entry in the minutes from the May meeting erroneously indicates that the rent increase was originally approved on a three-to-one vote.

not require a [pass-through] of any single expenditure in the absence of a showing that a park owner fails to realize sufficient income from the space rents of the park to pay for the expenditure, realize a fair rate of return on the investment in the park and other factors. [¶] Instead, [the ordinance] provides for an increase in space rents based upon the particular circumstances proven by the petitioner under an all inclusive formula. [¶] . . . [¶] [Morgan] failed to demonstrate that the expenditure . . . for the [Petromat] prevented [Morgan] from receiving a fair rate of return on the park; and, in fact, the 1995 Income Statement submitted by [Morgan] demonstrates that [Morgan] received revenues from space rents sufficient to pay all operating costs including the [Petromat installation] and that [Morgan] still realized a net operating income of 47% of gross revenues. [¶] . . . [¶] [Morgan] failed to submit any evidence whatsoever on her actual return on her investment in the park."

### 3. *Legal Action*

Morgan subsequently filed a three-count complaint. In count one, Morgan sought declaratory relief, alleging that the ordinance and the law required a fair rate of return and rent increases for necessary capital improvements. In count two, Morgan sought a writ of administrative mandamus, alleging that (1) the city acted in excess of its jurisdiction and failed to proceed in a lawful manner by refusing to allow a pass-through of the costs of the Petromat; (2) the city denied Morgan a fair trial by engaging in ex parte communications, making promises to real parties in interest, and "cooking" the administrative record; and (3) the city's decision was not supported by the findings. In count three, Morgan alleged a violation of substantive due process under section 1983 of title 42 of the United States Code.

The trial court initially found as a general proposition of law that the city was required to permit Morgan to recoup the costs of the Petromat and obtain a fair rate of return on that investment. The court then determined that the city exceeded its jurisdiction by holding its own evidentiary hearing after rejecting the findings of the committee, noting that the committee was the sole fact finder under the ordinance. The court next concluded that the city abused its discretion by ignoring the committee's factual findings and deciding the matter based on irrelevant issues, such as Morgan's rate of return on the mobilehome park as a whole. Lastly, the court concluded that the city deprived Morgan of a fair trial by showing bias against Morgan; prejudging what constitutes a capital improvement; delaying the proceedings for three years by remanding the matter for additional findings and failing to maintain the committee membership; and putting political pressure on the city attorney to change his advice, which he ultimately did. The court further indicated that the city's acts in excess of jurisdiction and abuses of discretion also contributed to the unfairness. The court granted the writ and ordered the city to

reconsider Morgan's petition in light of the court's opinion, "specifically this Court's findings that the committee's findings and recommendations were focused on the only relevant inquiry and that they were supported by substantial evidence."

The court next addressed the substantive due process claim made under section 1983 of title 42 of the United States Code, concluding that the council, by acting in the manner described above, had deliberately flouted the law and thereby violated due process within the meaning of *Galland v. City of Clovis* (2001) 24 Cal.4th 1003 [103 Cal.Rptr.2d 711, 16 P.3d 130]. The court awarded Morgan approximately $66,000 in damages and $140,000 in attorney fees, plus costs.

#### Discussion

The city, supported by several other amicus curiae cities, accurately notes that this case turns on a single issue: whether Morgan is entitled to a fair return on the Petromat investment, separate and apart from her return on the property as a whole. We agree with the city and supporting amici curiae that Morgan is not entitled to a separate return on the Petromat.

■ The city's ability to control rents is principally circumscribed by substantive due process, which requires that all legislation have " 'a reasonable relation to a proper legislative purpose.' " (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 771 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*).) As applied to price control legislation, such as the rent control ordinance at issue in this case, the reasonable relationship standard is satisfied so long as the price controls are not confiscatory; i.e., they do not deprive investors of a fair return on their investment. (*Ibid.*) There is no established standard for what amounts to a fair return; instead, the needs of the regulated industry to " 'maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, ' " must be weighed against the " 'appropriate protection for the relevant public interests, both existing and foreseeable.' " (*Id.* at p. 772.)

■ As should be apparent, the fair return standard is concerned with the financial integrity of the business as a whole, not the ability to obtain a return on a discrete portion of the business, such as a particular capital improvement. The California Supreme Court explicitly addressed this issue in *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216 [32 Cal.Rptr.2d 807, 878 P.2d 566], where it explained: " '[S]o long as rates as a whole afford [the regulated firm] just compensation for [its] over-all services to the public,' they are not confiscatory. [Citation.] That a particular rate may not cover the cost of a particular good or service does not work confiscation in and of

itself. [Citation.] In other words, confiscation is judged with an eye toward the regulated firm as an enterprise." (*Id.* at p. 293.) Thus, due process only requires a fair return on the mobilehome park as a whole, not a fair return on each discrete aspect of the park, such as the Petromat investment.

Despite clear Supreme Court precedent to the contrary, Morgan, the city attorney, and the trial court were all apparently misled by quotations taken out of context. For instance, at one point, the court in *Kavanau* notes: "A landlord is also entitled to a fair return on necessary capital improvements." (*Kavanau, supra,* 16 Cal.4th at p. 773.) And *Kavanau* cites *Sierra Lake Reserve v. City of Rocklin* (9th Cir. 1991) 938 F.2d 951, 958 (*Sierra Lake*), which provides in part: "[E]very dollar the landlord puts into the property by way of capital improvements constitutes an investment in the property for which a 'fair and reasonable' return must be allowed." Read in isolation, these quotations appear to indicate that a landlord is constitutionally entitled to an additional return for every additional investment. But when the quotations are placed in context, that interpretation proves to be erroneous.

*Kavanau* stated in whole: "Of course, the fair return principle is not limited to the property as it was when the landlord purchased it. A landlord is also entitled to a fair return on necessary capital improvements. [Citations.] For example, if a landlord retrofits an older building in order to comply with new building code requirements, the capital improvements may be the larger part of the building's value. In that case, if fair return did not take those capital improvements into consideration, it would be an empty promise. As the high court noted . . . , 'fair rate of return' depends on 'the amount of capital upon which the investors are entitled to earn that return.' [Citation.] Thus, a rent control law that merely allows a landlord to recoup the bare cost of a necessary capital improvement runs the risk of being confiscatory and thereby violating the landlord's right to due process of law." (*Kavanau, supra,* 16 Cal.4th at p. 773.) This passage merely stands for the unremarkable proposition that capital improvements must be taken into account as part of the overall investment when calculating a fair return on the business as a whole; it does not require an incremental increase in returns for every capital improvement. To illustrate this point, we will take the converse of the example used in *Kavanau*: If a landlord spends $1,000 on sidewalks, that investment is likely to be such a minuscule portion of the landlord's overall investment in the property that it will have no effect whatsoever on the ability to earn a fair return under existing rents.

*Sierra Lake* was also misunderstood. *Sierra Lake* involved a rent control pass-through ordinance that limited rent increases to what was necessary to recover the reasonable cost of capital improvements. (*Sierra Lake, supra,* 938 F.2d at pp. 953–954, 958.) *Sierra Lake* held that that ordinance "may" violate

due process because "every dollar the landlord puts into the property by way of capital improvements constitutes an investment in the property for which a 'fair and reasonable' return must be allowed. Breaking even is not enough; the law must provide for a profit on one's investment. [Citation.] Thus, [the ordinance] must do more than simply allow plaintiff to [pass-through] certain costs; it must ensure that plaintiff will receive a reasonable return on those expenditures." (*Id.* at p. 958.) *Sierra Lake* merely holds that the failure to allow for a return on capital improvements "may" violate due process. Again, this conclusion is unremarkable. Certainly, as noted in *Kavanau*, if the capital improvement constitutes the majority of the overall investment in the property, then the refusal to allow for a return on the capital improvement may prevent the investor from earning a fair return on the property as a whole. But even under *Sierra Lake*, a rent increase would be unnecessary if the capital improvement was such a small portion of the overall investment that existing rents continued to provide a fair return.

Insofar as *Sierra Lake* may be interpreted to require an additional return for every capital improvement, that conclusion is unsupported by the authority it cites. *Sierra Lake* merely cited *Guaranty Nat. Ins. Co. v. Gates* (9th Cir. 1990) 916 F.2d 508, 509, 512, 515, which struck down regulations that set insurance rates at a "break even" level, thereby denying insurers any return whatsoever. In doing so, *Guaranty* quoted *Federal Power Comm'n v. Hope Natural Gas Co.* (1944) 320 U.S. 591, 603 [88 L.Ed. 333, 64 S.Ct. 281]: "[T]he fixing of 'just and reasonable' rates, involves a balancing of the investor and consumer interests. . . . [T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock." Thus, *Guaranty* merely requires that regulations allow for a return on the business entity as a whole, not discrete portions of the business.[4]

 In summary, there is no support for the proposition that regulatory agencies are constitutionally required to grant a rent increase for every capital improvement. Instead, due process merely requires that the agency take capital improvements into account when evaluating whether the owner is

---

[4] The California Supreme Court has actually rejected *Guaranty* insofar as it may require a profit, noting: "In *Guaranty* [], there is language that may be read to erroneously state that the producer is constitutionally 'guarantee[d]' a ' "fair and reasonable return[,]" ' and that such a return must necessarily be above the 'break even' level. We will not indulge in such a reading." (*20th Century Ins. Co. v. Garamendi, supra,* 8 Cal.4th at p. 294, fn. 18.) The Supreme Court explained that, " '[a] regulated [firm] has no constitutional right to a profit . . . .' " (*Id.* at p. 294.) Instead, the interest in profits is only one consideration to be weighed against, among other things, the interest in protecting consumers from exploitation. (*Id.* at pp. 293–296.)

receiving a fair return on the property as a whole. If the existing rents are sufficient to provide the owner with a fair return on the overall project even after the capital improvement, then due process is satisfied.

There was also some controversy over whether the city's rent control ordinance required an increase in rents for every capital improvement. Morgan contended that it did, noting that the committee was instructed to consider "capital improvements." (Former Chino Mun. Code, § 2.68.060, subd. (E)).) Once again, a false impression is created by taking the quotation out of context. As noted above, the ordinance required the committee to "consider *all relevant factors, including, but not limited to*, increased or decreased costs to the mobilehome park owner attributable to utility rates, property taxes, insurance, advertising, governmental assessments, cost of living increases attributable to incidental services, normal repair and maintenance, capital improvements, and the upgrading and addition of amenities or services, as well as a *fair rate of return on investments*." (*Ibid.*, italics added.) Thus, the committee was specifically instructed to consider all relevant facts, including the fair rate of return on the "investments," plural. In that respect, the ordinance merely incorporates the substantive due process standard discussed above, focusing the inquiry on the rate of return on the project as a whole in light of all the investments, including capital improvements.

■ In conclusion, neither the state or federal Constitution, nor the ordinance, requires the city to give Morgan a rent increase just because Morgan made a capital improvement. Instead, the capital improvement is only one relevant factor to be considered when determining whether Morgan is earning a fair return on the park as a whole.[5]

\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and costs are awarded to the City of Chino.

Ramirez, P. J., and Hollenhorst, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 16, 2004.

---

[5] Whether the Petromat constituted a capital improvement remains a hotly contested issue. We need not resolve that issue and therefore assume for the sake of argument that the Petromat was a capital improvement.

\*See footnote, *ante*, page 1192.