Filed 6/21/16  Wise v. City of Escondido CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ROBERT WISE, | D068806 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2-14-00083252-CU-WM-NC) |
| CITY OF ESCONDIDO et al., | |
| Defendants and Respondents; | |
| _____ | |
| AMERICORP ENTERPRISES, INC., | |
| Real Party in Interest and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, Timothy M. Casserly, Judge.  Affirmed.


David A. Kay for Plaintiff and Appellant.

Jeffrey R. Epp, City Attorney, Allegra D. Frost, Deputy City Attorney, for Defendant and Respondent.

Hart & King, C. William Dahlin and Rhonda H. Mehlman for Real Party in Interest and Respondent.

Robert Wise, a resident of the Sundance Mobile Home Park (the Park), appeals from an adverse judgment on his complaint and petition for writ of mandate that challenged a decision of the City of Escondido's Mobilehome Park Rental Review Board (the Board) approving an application by the Park's owner, Amicorp Enterprises, Inc. (Amicorp),[1] to raise the monthly rent of 29 spaces in the Park under the mobilehome rent control ordinance of the City of Escondido (the City). Wise contends (1) the trial court applied an improper legal standard in reviewing the Board's decision when it applied the substantial evidence test rather than the independent judgment test; and (2) under either legal standard, the Board's decision to approve a rent increase of $124.37 per month was not supported by the evidence. We conclude that Wise's arguments lack merit, and accordingly we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

The Park was built in 1977 and is located in the City. It consists of 88 mobilehome spaces and various amenities, including a large clubhouse and a swimming pool.

From January 2006 to December 2010, all of the spaces at the Park were subject to five-year, long-term leases, which allowed for an annual rent increase of 75 percent of the

---

[1] Amicorp was erroneously identified in the caption of the complaint and writ of mandate as Americorp Enterprises, Inc.

2

consumer price index (CPI).[2]  Under Civil Code section 798.17, mobilehome spaces that are subject to leases for a term in excess of 12 months and that meet other conditions are exempt from regulation under local rent control ordinances.

The long-term leases expired at the end of 2010.  Several tenants decided not to renew their leases under the terms offered by Amicorp, and therefore those tenants' spaces became subject to the City's mobilehome rent control ordinance.

On January 3, 2013, Amicorp submitted to the Board[3] a long-form application for a rent increase on the spaces in the Park that were not covered by long-term leases.[4]  At the time the Board considered the application, 29 spaces were at issue, and the average then-existing monthly rent for those spaces was $534.  In comparison, the average monthly rent for the 59 spaces still subject to long-term leases was $672.  Amicorp's application sought permission to raise the rent on the 29 nonexempt spaces by $771.94, which would have resulted in an average monthly rent of $1,305.94 for those spaces.

[2]      "The CPI 'is a statistical measure of fluctuations in urban consumers' costs of living widely used to measure the dollar's purchasing power.  The United States Bureau of Labor Statistics computes the index by calculating percentage price changes of a sample "market basket" of goods and services in major expenditure groups, then weighs the percentage price changes in accordance with the relative importance of each item.  The index is the average of these weighted percentage price changes.' " (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 5, fn. 2 (*Berger*).)

[3]      The Board is comprised of the members of the City Council.

[4]      According to the record, the Board also allows for a " 'short-form' application," under which a park owner may obtain a rent increase equal to 75 percent of the increase in the CPI without providing operating expense information.  Under a short-form application, Amicorp would have been entitled to obtain an average monthly rent increase of $20.32 for the 29 spaces if the increase was not opposed by a majority of the impacted tenants.

Amicorp argued that an increase of $771.94 was required because it should be afforded a 12 percent fair return on the value of the Park, which it determined to be $7,500,000. In the alternative, Amicorp took the position that the monthly rent for each space should be at least $950, based on what it contended were existing rental rates at comparable mobilehome parks.

The Board retained expert Kenneth Baar to analyze Amicorp's application.[5] Baar has served as a consultant to numerous California jurisdictions on rent control issues. In his report, Baar rejected the methodology suggested by Amicorp and instead employed the maintenance of net operating income (MNOI) approach to analyze whether a rent increase was required to allow Amicorp to obtain a fair return on its property. According to Baar, the Board historically used the MNOI standard when analyzing applications for rent increases, and courts have approved the use of the MNOI standard. As Baar explained, under an MNOI analysis, "fair return is defined as net operating income . . . as of a specified date adjusted by a specified inflation index." Specifically, "the fair net operating income for the current year is determined by 'indexing' the base year net operating income, based on a CPI factor."

Baar used 1988 as the base year for the MNOI analysis, as that was the year when the City's mobilehome rent control ordinance was adopted. Baar's MNOI analysis then proceeded by (1) determining the net operating income that Amicorp received for the

_____

[5] The Board also retained James Brabant to analyze Amicorp's position concerning the rents lawfully charged in comparable mobilehome parks. We do not further discuss Brabant's analysis, as it is not pertinent to the issues on appeal.

4

spaces at the Park as of 1988; (2) adjusting that amount by a percentage of the increase in the CPI between 1988 and 2012 to determine the present-day equivalent of the 1988 net operating income; and (3) determining whether any increase in rent was needed to enable Amicorp to obtain the same effective net operating income that it was receiving in 1988. As a result of his MNOI analysis, Baar concluded that to afford Amicorp a fair return on the Park, depending upon certain assumptions made as to three variables, a minimum rent adjustment ranging from zero to $179.35 was required. This range of possible outcomes was set forth on "Table 6" in Baar's report that set forth 16 different possible rent adjustments.

Baar's report explained that the range of figures for the minimum required rent adjustment in Table 6 resulted from different possible assumptions by the Board as to three variables:

"(a) Should the income from all spaces or only the rent controlled spaces be considered in the analysis.

"(b) In determining fair net operating income should the base period net operating income be adjusted by 40% or 100% or some other percentage of the percentage increase in the CPI since the base year.

"(c) Should any adjustments be made to [Amicorp's] projections of base year and current year income and operating expenses for the purposes of a [MNOI] analysis."

Although Baar's report set forth arguments for and against selecting certain outcomes as to the three variables, he did not endorse any specific approach. At the Board hearing on Amicorp's application, Baar made clear that, in his expert opinion, it would be acceptable to resolve the three variables in any manner the Board considered

5

appropriate. Therefore, in Baar's opinion the Board reasonably could select any monthly rent increase for the 29 spaces within the range of figures included in Table 6, ranging from zero to $179.35.[6]

On August 28, 2013, the Board held a hearing on Amicorp's application. Several residents of the Park spoke in opposition to the application and submitted written materials prior to the hearing. At the conclusion of the hearing, the Board approved a monthly rent increase of $124.37 per space for the 29 spaces at issue.[7]

The Board members' comments made clear that the Board had proceeded by selecting $124.37 from Table 6 of Baar's report and thereby resolving the three variables that Baar identified by (1) using the income from the rent controlled spaces, not from the entire Park; (2) indexing the base year income by a factor of 75 percent of the increase in the CPI; and (3) not making any adjustments to the net operating income and expense

[6]    Specifically, at the hearing a Board member asked Baar about the range of figures set forth on Table 6, inquiring whether "from your perspective . . . this Board actually has an opportunity to . . . , in theory, to choose any of these numbers, based upon the direction they want to go, correct?" Baar answered, "Right. Yes." Baar added the qualification that on the issue of whether to use income from only the rent-controlled spaces or from the whole Park, "there's been very little test of this issue legally" and thus "looking at the rent-controlled spaces" would be "taking a more . . . conservative or careful approach."

[7]    The Board also granted Amicorp's request to charge the Park residents for $25,000 in fees incurred in connection with the application, with payments prorated among the residents and spread over five years. We note that the Board's resolution originally directed that the costs were to be divided among the 88 spaces in the Park, but upon application by Amicorp, the Board amended the resolution to provide that the cost award was to be divided among the 29 spaces that were the subject of the rent increase application, for a temporary rent increase of $17.07 per month. Wise makes no specific legal argument challenging the award of the $25,000 in fees to Amicorp, and we accordingly do not consider that issue.

6

figures submitted by Amicorp for the base year and the current year. During the hearing, Board members commented that a rent increase of $124.37 per month (for an average total rent of $658.37 per month) would be a fair, just and reasonable rent based on the superior quality of the Park, the fact that the 59 other residents of the Park had voluntarily entered into leases at an average amount of $672 per month, and the fact that the rent payment included the provision of utilities.

The Board's decision was formally adopted in a resolution on September 11, 2013. The resolution declared that "an increase of $124.37 according to a [MNOI] analysis with a 75 percent CPI indexing ratio and using only rent controlled income provides a fair return, and provides a rent approaching the rents paid by residents who have long[-]term leases at [the Park]." It further declared that "a 75 percent indexing ratio for the [MNOI] is fair, just, and reasonable because it is in line with the indexing ratios used by other municipalities in California." Accordingly, the resolution set forth the Board's determination that "an average increase of $124.37 per space per month is fair, just, and reasonable"

Wise and three other residents of the Park filed a complaint for declaratory relief and a petition for writ of mandate against the City and the Board on January 14, 2014, (collectively, the Petition) with Amicorp named as the real party in interest. The Petition alleged the Board abused its discretion by approving the rent increase of $124.37 per month in that it made certain unwarranted decisions as to the three variables set forth in Baar's MNOI analysis. The relief sought included an order declaring the Board's decision to be void and the issuance of a writ of mandate directing the Board to vacate its decision.

7

The parties stipulated that the trial court would consider the Petition by way of a noticed motion for issuance of a writ of mandate, with a stipulated briefing schedule. The briefing in favor of the writ of mandate argued (1) the trial court should apply the independent judgment test in reviewing the Board's decision, rather than the substantial evidence standard; and (2) under any standard, the Board abused its discretion in how it resolved the question of the three variables pertinent to the MNOI analysis identified in Baar's report.

After considering the matter, the trial court entered judgment against Wise and the other petitioners, concluding that the Board's decision was supported by substantial evidence in the record.

II.

DISCUSSION

A.  *As No Fundamental Vested Rights Are at Issue, the Board's Decision Is Reviewed to Determine If It Is Supported by Substantial Evidence*

We first consider Wise's contention that because fundamental vested rights of the Park's residents are purportedly implicated by the Board's rent control decision, the trial court should have reviewed the Board's decision under an independent judgment standard, not the substantial evidence standard.

"An aggrieved party may seek judicial review by a trial court of a local mobilehome rent control board's final decision by seeking a writ of mandate . . ." under Code of Civil Procedure section 1094.5.  (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 287 (*Carson Harbor*

8

*Village*).)  In such a proceeding, " '[a] trial court's review of an adjudicatory administrative decision is subject to two possible standards of review depending upon the nature of the right involved. . . .  If the administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence. . . .  The trial court must not only examine the administrative record for errors of law, but must also conduct an independent review of the entire record to determine whether the weight of the evidence supports the administrative findings. . . .  If, on the other hand, the administrative decision neither involves nor substantially affects a fundamental vested right, the trial court's review is limited to determining whether the administrative findings are supported by substantial evidence.' "  (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 926, citations omitted (*Saraswati*).)  When a substantial evidence standard applies to the trial court's consideration of a petition for writ of mandate, as an appellate court "we 'answer the same key question as the trial court . . . whether the agency's findings were based on substantial evidence.' "  (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 218-219 (*MHC*).)

"[C]ourts must decide on a case-by-case basis whether an administrative decision substantially affects fundamental vested rights, and there is no fixed formula which guarantees a predictably exact ruling in each case.  The essence of the determination is to protect the fundamental rights of the individual from abrogation without judicial, as opposed to administrative, review. . . .  In analyzing the fundamental nature of the right, the court manifests slighter sensitivity to the preservation of purely economic privileges."

(*San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos* (1987) 192 Cal.App.3d 1492, 1499, citation & fn. omitted (*San Marcos*).) "An inquiry must be made on a case-by-case basis as to whether the property right at issue fundamentally affects the life situation of the individual, or whether it merely impacts an area of economic privilege in a less than fundamental manner." (*Id*. at p. 1502.) The right must not only be *fundamental*, but also *vested*. Thus, the court asks whether the right "is possessed by, and vested in, the individual or merely *sought* by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 144, italics added (*Bixby*).) "Fundamental vested rights are often found in the context of public employment rights, licensing decisions, public assistance benefits and land use." (*Saraswati*, *supra*, 202 Cal.App.4th at p. 927.)

Case law has repeatedly held that when the owner of a mobilehome park brings a petition for writ of mandate to challenge the decision of a mobilehome rent control board, the trial court applies a substantial evidence standard of review. (*Berger*, *supra*, 127 Cal.App.4th at p. 7; *MHC*, *supra*, 106 Cal.App.4th at p. 218; *Rainbow Disposal Co. v. Escondido Mobilehome Rental Review Bd.* (1998) 64 Cal.App.4th 1159, 1165 (*Rainbow*); *Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd.* (1994) 30 Cal.App.4th 84, 90; *Yee v. Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1106 (*Yee*); *San Marcos*, *supra*, 192 Cal.App.3d at p. 1500.) Specifically, case law holds that although a mobilehome park owner's rights to substantive due process and to

10

be protected from an unconstitutional taking of its property are implicated in a rent control proceeding (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1024 (*Galland*); *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 770 (*Kavanau*)), the owner's fundamental vested rights are not at issue in such a proceeding, as rent increases fall into the less sensitive category of the " 'preservation of purely economic privileges.' " (*San Marcos*, at p. 1500; see also *MHC*, at pp. 217-218; see also *Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, 1414.)

Wise argues that this case law is not controlling because this is an action brought by the *residents* of a mobilehome park, not the park owner. Challenges brought by residents of mobilehome parks to decisions of mobilehome rent control boards are uncommon in the published case law. Accordingly, we are aware of only one published authority that has considered the issue of the standard of review applicable when residents of a mobilehome park challenge the decision of a rent control board. In that decision, *Robinson v. City of Yucaipa* (1994) 28 Cal.App.4th 1506, residents of a mobilehome park contended that a provision of the Civil Code preempted a city ordinance allowing a mobilehome park owner to obtain a rent increase based on capital improvement expenses. (*Id*. at p. 1512.) *Robinson* concluded that the preemption issue was a matter of statutory interpretation subject to independent review. (*Id*. at pp. 1516-1517.) However, *Robinson* went on to observe that "[t]he remaining question, the propriety of the Commission's approval of a rent increase, is a question of fact subject to review *under the substantial evidence standard*. Residents do not challenge the sufficiency of the evidence to support the Commission's decision." (*Id*. at p. 1517, italics

11

added.)  As we will explain, although *Robinson*'s statement about the substantial evidence standard of review in *Robinson* is arguably dictum, we perceive no reason to depart from *Robinson's* holding.

First, whatever rights Wise might identify as being at stake in a rent control proceeding, any such rights would be purely *economic.*  "[W]hen a case involves or affects purely economic interests, courts are far less likely to find a right to be of the fundamental vested character."  (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1060.)  Courts acknowledge that in some exceptional circumstances an economic right might qualify as fundamental if the loss of that right could "fundamentally affect[] the life situation of the individual."  (*San Marcos*, *supra*, 192 Cal.App.3d at p. 1502.)  However, that is not the situation here.  Although Wise makes a vague suggestion that park residents could end up being evicted if a rent increase was too high, there is no evidence in the record that any eviction will occur as a result of the $124.37 rent increase approved by the Board.  (See *San Marcos*, *supra*, 192 Cal.App.3d at p. 1502 [stating that fundamental vested rights were not at issue because "there is no contention, nor does the evidence suggest, that if the [agency] denied the requested rent increases, the park owners would be in such an unfavorable economic position they would go out of business"].)

Further, Wise cannot establish that any rights have *vested* in the Park residents. The Park's residents do not already possess a right to pay only a specific amount of rent. (See *Bixby*, *supra*, 4 Cal.3d at p. 144 [a right is not vested if it is "merely sought"].)  This situation is therefore not comparable to the cases cited by Wise in which a party *already*

12

had a *vested right* to a service-connected death allowance under a retirement plan (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28) or a conditional use permit for a preexisting business (*Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519).

We accordingly conclude that use of the substantial evidence standard of review is appropriate in this case. " 'In general, substantial evidence has been defined . . . as evidence of " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' " [citation]; and . . . as " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " ' " (*Berger*, *supra*, 127 Cal.App.4th at p. 7.)

B.      *The Board's Decision Is Supported by Substantial Evidence*

Application of the substantial evidence test "inherently requires that the reviewing court first determine the question, 'Substantial evidence of what?' " (*Yee*, *supra*, 17 Cal.App.4th p. 1106.) To answer that question, we look to the City's mobilehome rent control ordinance, the applicable constitutional standards and applicable case authority.

1.      *Legal Standards Applicable to the Board's Decision*

Here, the City's mobilehome rent control ordinance provides:

"The board shall approve *such rent increase as it determines to be just, fair and reasonable.* The board shall consider the following factors, in addition to any other factors it considers relevant, in making such determination:

"(1)  Changes in the Consumer Price Index for All Urban Consumers in San Diego Metropolitan Area published by the Bureau of Labor Statistics.

"(2)  The rent lawfully charged for comparable mobilehome spaces in the City of Escondido.

13

"(3)  The length of time since either the last hearing and final determination by the board on a rent increase application or the last rent increase if no previous rent increase application has been made.

"(4)  The completion of any capital improvements or rehabilitation work related to the mobilehome space or spaces specified in the rent increase application, and the cost thereof, including such items of cost, including materials, labor, construction interest, permit fees, and other items as the board deems appropriate.

"(5)  Changes in property taxes or other taxes related to the subject mobilehome park.

"(6)  Changes in the rent paid by the applicant for the lease of the land on which the subject mobilehome park is located.

"(7)  Changes in the utility charges for the subject mobilehome park paid by the applicant and the extent, if any, of reimbursement from the tenants.

"(8)  Changes in reasonable operating and maintenance expenses.

"(9)  The need for repairs caused by circumstances other than ordinary wear and tear.

"(10) The amount and quality of services provided by the applicant to the affected tenant.

"(11) Any existing written lease lawfully entered into between the applicant and the affected tenant."  (Escondido Mun. Code, §  29-104, subd. (g), italics added.)

Case law explains that a review board should set a rent that falls within a "broad zone of reasonableness."  (*Galland*, *supra*, 24 Cal.4th at p. 1026.)  "[W]ithin this broad zone, the rate regulator is balancing the interests of investors, i.e., landlords, with the interests of consumers, i.e., mobilehome owners, in order to achieve a rent level that will on the one hand maintain the affordability of the mobilehome park and on the other hand allow the landlord to continue to operate successfully."  (*Ibid*.)  A rent increase should be

14

" 'one which is not so high as to defeat the purpose of rent control nor permit landlords to demand of tenants more than the fair value of the property and services which are provided.' " (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887, 907.)

In challenges brought *by park owners*, an additional requirement is added to a rental control review board's inquiry, as park owners have a constitutional right to a fair return on their property. " 'Constitutionally valid rent control schemes must allow park owners to earn a "just and reasonable" or "fair" return on their investment.' " (*Berger*, *supra*, 127 Cal.App.4th at p. 7.) Thus, case law implies into all mobilehome rent control ordinances, including the City's, the additional requirement that when determining a reasonable rent, the review board must also find that the park owner is, *at a minimum*, receiving a fair return on its property. (*Carson Harbor Village*, *supra*, 70 Cal.App.4th at p. 288 ["Fair return is the constitutional measuring stick by which every rent control board decision is evaluated."].)

"Although the term 'fair rate of return' borrows from the terminology of economics and finance, it is as used in this context a legal, constitutional term. It refers to a constitutional *minimum* within a broad zone of reasonableness." (*Galland*, *supra*, 24 Cal.4th at p. 1026.) No specific method is required to be used to arrive at a fair return. "The California Supreme Court has 'expressly reject[ed] the notion that any particular formula must be used in determining a just and reasonable return.' . . . Rather, the 'selection of an administrative standard by which to set rent ceilings is a task for local governments . . . and not the courts.' " (*Berger*, *supra*, 127 Cal.App.4th at pp. 8-9,

15

citations omitted.) Thus, we focus on whether "the regulatory scheme's *result* is just and reasonable" not the method by which it was reached. (*Kavanau*, *supra*, 16 Cal.4th at p. 778; see also *Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 191.) Courts have specifically approved the use of the MNOI analysis as an acceptable method of determining whether a rent increase is required to afford a park owner a minimum fair return on its property. (*Berger*, *supra*, 127 Cal.App.4th at p. 9; *MHC*, *supra*, 106 Cal.App.4th at p. 221; see also see also *Rainbow*, *supra*, 64 Cal.App.4th at p. 1172 [" 'The [MNOI] approach has been praised by commentators for both its fairness and ease of administration.' "].)

2.      *Wise's Challenge to the Board's Decision*

We now turn specifically to Wise's challenges to the Board's decision. Wise contends that based on the evidence before the Board, the Board was not justified in its decision to resolve the issue of the three variables set forth in Baar's MNOI analysis by (1) using the income from the rent controlled spaces, not from the entire Park; (2) indexing the base year income by a factor of 75 percent of the increase in the CPI; and (3) not making any adjustments to the net operating income and expense figures submitted by Amicorp for the base year and the current year. Wise contends that the Board should have opted for a different resolution as to the three variables, and had it done so, the Board would have chosen one of the *lower* rental adjustments from the 16

16

options set forth on Table 6 in Baar's report.[8]  As we will explain, Wise's argument is without merit because substantial evidence supports the Board's decision to resolve the three variables as it did.

At the outset we note that it is a matter of expert opinion whether a park owner is obtaining a fair return.  "Weighing the competing interests of owners and tenants and satisfying constitutional criteria is not a task within common experience.  To the contrary, courts 'consider it a matter of expert opinion what rate of return on a mobilehome park is fair.' "  (*Berger*, *supra*, 127 Cal.App.4th at p. 11.)  Here, as we have described, Baar stated that *any* resolution of the three variables and *any* of the 16 options set forth on Table 6 would be reasonable based on his expert opinion.  Therefore, relying on Baar's expert opinion, as we must, the Board's decision to select the amount of $124.37 as the

---

[8]     Although Wise's appellate arguments focus on challenging the Board's MNOI analysis, we note that some of the factors in the City's mobilehome rent control ordinance are not directed at an MNOI analysis, but instead focus more on determining whether park residents are paying more than a just, fair and reasonable rent.  These factors include "[t]he rent lawfully charged for comparable mobilehome spaces in the City of Escondido" and "[t]he amount and quality of services provided by the applicant to the affected tenant."  (Escondido Mun. Code, § 29-104, subd. (g)(2) & (10).)  The Board focused on both of those factors during the hearing when it commented on the superior quality of the Park (which included the provision of utilities) and the comparable rents voluntarily agreed to by the tenants in the Park who entered into long-term leases.  Although not his main point, Wise comments that any rental rate not arrived at through the rental control review process is necessarily unreasonably high and unfair to renters, so that it was unreasonable for the Board to have relied on the fact that the Park's other residents paid an average of $672 under their long-term leases.  Wise's assumption is flawed.  The City's mobilehome rent control ordinance necessarily impacts the prices that mobilehome park residents will voluntarily agree to pay in long-term leases.  Mobilehome park residents in the City have the option, as Wise and 28 other Park residents chose here, to refuse to enter into a lease they believe is unreasonable, and to force the park owner to rely on the rent control review process to set the rent.

17

minimum rent increase required under the MNOI analysis is supported by substantial evidence.

Wise erroneously contends that the Board "refused to adopt either the reasonable assumptions or the accurate formulas presented by Dr. Baar." According to Wise, Baar made a "recommendation that either [Amicorp] receive no rent increase, or that [it] receive the same $20.32 rent increase [it] would have obtained by using the 'short form' " application. Wise misrepresents the record, as Baar made no such recommendation. On the contrary, as we have explained, Baar's MNOI analysis set forth a range of possible minimum required rent increases, between zero and $179.35, depending on how the Board decided to resolve the three variables that he presented, and Baar made clear that any figure the Board selected from the range presented would be reasonable in his expert opinion. Thus, this case is not similar to *Berger*, which determined that the Board's rent increase was not supported by substantial evidence when the Board rejected Baar's expert opinion about the minimum rent increase required under an MNOI analysis and instead used its own method to arrive at a lower rent increase that Baar concluded was constitutionally required. (*Berger*, *supra*, 127 Cal.App.4th at p. 12 ["Dr. Baar neither recommended a $25 rent increase based on the single factor of comparable rents, nor stated such an increase would satisfy the fair return standard. Rather, he believed a minimum increase of $38.44, under a modified MNOI standard, was required to meet the fair return standard."].) Here, the Board *specifically followed Baar's recommendation* to choose a figure within the ranges presented in Table 6 of Baar's report to afford Amicorp a minimum fair return.

Case law makes clear that it is not our role as a court to delve into the *method* of how an administrative body determines whether a park owner is receiving a fair return. (*Berger*, *supra*, 127 Cal.App.4th at pp. 8-9.) Nevertheless, when we focus on the *details* of Baar's expert report and the other evidence at the hearing we find that the record amply supports the Board's decision on each of the three variables that led it to select $124.37 as the minimum rental increase required to afford Amicorp a fair return.[9]

### a. *Considering Income from Only Rent-controlled Spaces*

The first of the three variables that Baar identified was whether "the income for all spaces or only the rent controlled spaces be considered in the analysis." As we have explained, the Board chose to use the income from only the rent-controlled spaces in its analysis.

Substantial evidence supports the Board's decision to rely on only the rent-controlled spaces. Specifically, Baar explained in his report that "[t]here are notable rationale for including and for excluding the income from the exempt spaces in an MNOI analysis."[10] In support of considering the income from only rent-controlled spaces, Baar

---

[9] In his opening brief, Wise also argues that Baar's MNOI analysis adopted by the Board was flawed because it assumed a base year of 1988 rather than 2010. Wise did not raise this argument in the trial court, and we will not consider it for the first time on appeal. (*Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592 [" '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' [Citation omitted.] Such arguments raised for the first time on appeal are generally deemed forfeited."].)

[10] As Baar correctly acknowledged, no case law specifically requires use of either approach. Wise's citations to *Morgan v. City of Chino* (2004) 115 Cal.App.4th 1192;

explained that "[i]f all of the income from a mobilehome park is considered when a substantial portion of the spaces are exempt from rent regulation[,] a park owner may never be entitled to increase the net operating income yielded by rent controlled spaces," and "[t]his outcome may be seen as going beyond the purpose of providing protection against unreasonable rent increases." Moreover, as Baar stated at the hearing, the more conservative approach would be to use only the income from the rent controlled spaces. These expert statements by Baar provide substantial evidence in the record for the Board's choice to select a minimum required rent increase that was based on an MNOI analysis using income from only the rent-controlled spaces.

b.    *Indexing Factor of 75 Percent of the Increase in the CPI*

The second variable identified by Baar was whether "[i]n determining fair net operating income . . . the base period net operating income [should] be adjusted by 40% or 100% or some other percentage of the percentage increase in the CPI since the base year." As we have explained, the Board chose to use an indexing factor of 75 percent of the increase in the CPI. In the trial court, Wise took the position that the Board was required to apply an indexing factor of no more than 40 percent of the increase in CPI. Now, on appeal, Wise appears to contend that an indexing factor of no more than

---

*Carson Harbor Village*, *supra*, 70 Cal.App.4th 281; and *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 do not support his argument because none of them held that only rent controlled spaces may be considered in an MNOI analysis.

20

60 percent was required.[11]  Neither position is meritorious because, as we will explain,

substantial evidence supports the Board's selection of a 75 percent indexing factor.

Baar's report explained that the City had traditionally used a 40 percent indexing

rate.  In addition, under the short form procedure, park owners are entitled to a 75 percent

of CPI increase.  Baar pointed out that no specific indexing rate was legally required, and

"[a]mong the rent controlled jurisdictions which use MNOI standards there are significant

differences in the rates by which net operating income is adjusted.  'Indexing ratios' vary

from 40% to 100% of the percentage increase in the CPI."  Baar provided a chart that

showed the range in different jurisdictions.  As one of the Board members observed at the

hearing, based on the chart prepared by Baar, an indexing rate of 75 percent appeared to

be the average rate applied in other jurisdictions.

Baar also explained the theoretical justification for applying less than a

100 percent CPI indexing rate in an MNOI analysis for a mobilehome park.  Put simply, a

mobilehome park is usually a leveraged investment in which a park owner's equity in the

real estate investment will normally increase at a rate greater than the increase in the CPI,

---

[11]    Wise's current position that the Board was required to apply no more than a
60 percent indexing rate appears to be based on his assertion that guidelines adopted by
the Board call for the application of a 60 percent indexing rate.  We note that the
guidelines that Wise refers to are not included in the record, but written comments that
the City staff prepared for the hearing on Amicorp's application do quote from them to
some extent.  Because neither the full text of the guidelines, nor an explanation of their
intended role in the Board's decisionmaking are before us, we do not consider Wise's
argument to the extent it is based on the Board guidelines.  Further, Wise has presented
no reason why the Board could not depart from their guidelines based on Baar's expert
opinion.

so that a fair return is afforded to the park owner even when rents for the spaces in the park do not increase by a factor of 100 percent of the CPI increase.[12]

Based on this material in the record, we conclude that substantial evidence supports the Board decision to select a 75 percent indexing factor as part of the MNOI analysis, and thereby arrive at a minimum required rent increase of $124.37.

      c.     *No Adjustment to Base Year and Current Year Income and Operating Expenses*

The final variable identified by Baar was "[s]hould any adjustments be made to [Amicorp's] projections of base year and current year income and operating expenses for the purposes of a[n MNOI] analysis."  Specifically, Baar presented three possible adjustments to the income and operating expense figures supplied by Amicorp, and he gave the Board the option whether to make those adjustments in its MNOI analysis.  As noted, the Board chose *not* to make any adjustment to the figures presented by Amicorp. We consider whether substantial evidence supports the Board's decision not to make the adjustment to Amicorp's figures.

      i.     *Discrepancy with Previously Submitted Figures*

Baar pointed out that Amicorp had made a prior application for a rental increase in 1989, and at the time of that application, it claimed to have income and operating expenses for 1988 that were different from the 1988 income and operating expenses

---

[12]    Baar stated, "The 'leveraged' nature of real estate investments may allow investors to obtain a reasonable return on their investments when rates of indexing are well below 100% of CPI.  As a result of the leveraging factor, the return on investment may be a multiple of the rate of increase in the net operating income and value of the property."

22

identified in the 2013 application, with the new application including $3,233 less in operating expenses. Baar discussed the possibility of using the old figures rather than the new figures, but he also pointed out that the old figures were not complete because some of the document that Amicorp submitted in 1989 was cut off in photocopying. Further, Amicorp pointed out that the figures in the 1989 application were not necessarily prepared or reviewed by a certified public accountant (CPA). Amicorp's CPA stated that the figures used in Amicorp's 2013 submission were more reliable, as they were based on profit and loss statements prepared by a CPA.

We conclude that based on the statement from Amicorp's CPA that the new figures were more reliable, and the fact that the document from 1989 was incomplete, there was substantial evidence in the record supporting the Board's decision *not* to make an adjustment to the figures that Amicorp submitted in 2013 based on the discrepancy with the 1989 submission.

ii. *Imputed 5 Percent Management Fee*

Baar pointed out that Amicorp included an imputed 5 percent management fee when setting forth its operating expense projection for 2012, which Baar found to be a reasonable approach. However, Baar also pointed out that Amicorp did not include a comparable 5 percent management fee in its operating expenses for the base year of 1988. Baar therefore stated that Amicorp's income and expenses for 1988 could be adjusted by adding an imputed 5 percent management fee expense of $15,193 for that year. As with Baar's other possible adjustments, the Board did not make this adjustment in its MNOI analysis.

23

Amicorp's CPA, Gary Capata, spoke at the hearing and explained to the Board why Baar's suggested adjustments were not necessary. Capata explained, "We already made adjustments as appropriate. We feel that when Dr. Baar makes adjustments, he misstates the already adjusted results."

As Capata had expertise as a CPA and was the person who prepared the relevant financial documents, the Board properly could decide to rely on Capata's testimony as substantial evidence for not making the adjustment of $15,193 to the 1988 income and expense figures.

### iii.    *Maintenance Expenses*

Amicorp projected maintenance expenses of $45,424 for 2012. However, as Baar pointed out, Amicorp's maintenance expenses fluctuated widely over the previous five years. Therefore Baar suggested that the Board could average the types of maintenance expenses for the past five years rather than using Amicorp's projection, which would result in $35,662 in maintenance expenses for 2012.

At the hearing, Capata disagreed with Baar's suggested adjustment. He stated that he did not agree that maintenance expenses should "be based on the past five years" and he "[did not] see a justification" for the adjustment. As Capata explained, "Costs are increasing every year. This is an old park."

The Board was entitled to rely on Capata's opinion as a CPA and as someone familiar with the Park's financial condition. Accordingly, substantial evidence supports the Board's decision not to make the adjustment identified by Baar.

24

Having reviewed each contention raised by Wise challenging the Board's MNOI analysis, we conclude that Wise's arguments lack merit, and the Board's decision allowing Amicorp to institute a $124.37 monthly rental increase for the 29 spaces covered by Amicorp's application is supported by substantial evidence.

DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.

25